566 F.2d 994
 16 Fair Empl.Prac.Cas. 693, 15 Empl. Prac.
Dec. P 8060
Charlie CORLEY and Levaughn Carter, Individually and on
behalf of all others similarly situated,
Plaintiffs-Appellants,
v.
JACKSON POLICE DEPARTMENT, etc., et al., Defendants-Appellees.
Charlie CORLEY and Levaughn Carter, Plaintiffs-Appellants,
v.
Russell C. DAVIS, Mayor and Commissioner of the City of
Jackson, et al., Defendants-Appellees.
 No. 75-3932.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 30, 1978.
 
 Frank R. Parker, Lawyers' Committee for Civil Rights Under Law, Jackson, Miss., for plaintiffs-appellants.
 Michael Farrell, E. Grady Jolly, John E. Stone, City Atty., Jackson, Miss., for defendants-appellees.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before COLEMAN, SIMPSON and TJOFLAT, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 In this Title VII employment discrimination case,[1] Charlie Corley and Levaughn Carter, former officers of the Jackson, Mississippi, Police Department, allege that their discharge from the force was based on their race and their opposition to the Department's discriminatory employment practices. The Jackson Police Department contends that Corley and Carter were discharged solely because they accepted a bribe from a known bootlegger. In response, Corley and Carter deny the payoff charge and maintain that it was merely a pretext for discrimination, noting that other officers similarly accused were neither investigated nor discharged. The district court accepted the Police Department's version and held for the defendants. Because the district court failed to apply the correct substantive law in deciding this case, we reverse and remand for a new trial.
 
 I. STATEMENT OF THE CASE
 
 2
 Corley and Carter, two black officers of the Jackson Police Department, were discharged on December 4, 1972, on the charge that two nights earlier they each received a payoff of $5.00 from a known bootlegger. They filed their first complaint as a class action on January 11, 1973, seeking reinstatement for themselves and relief on behalf of a class of present and future black employees alleging denial of due process and retaliation in violation of the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1982, and 1983. Subsequently, Corley and Carter sought and obtained "right-to-sue" letters[2] on their charges pending before the Equal Employment Opportunity Commission (EEOC), and timely filed their second complaint on September 3, 1974, as an individual action alleging that they were discharged in violation of Title VII because of race, 42 U.S.C. § 2000e-2(a), and in retaliation for opposing practices made unlawful by Title VII, 42 U.S.C. § 2000e-3(a). Named as defendants in each case were the Mayor and City Commissioners of Jackson, the City of Jackson, the Jackson Police Department, the Chief of Police and two investigating officers, and the Jackson Civil Service Commission. The class issues in the first complaint were resolved by a Consent Decree filed on March 25, 1974. The remaining issues of the two complaints relating to the discharge of Corley and Carter were consolidated for trial, which was held without a jury before U. S. District Judge Harold Cox on July 8-11, 1975. On September 25, 1975, Judge Cox entered his unpublished memorandum opinion finding against the plaintiffs; a final judgment for the defendants was entered on October 7, 1975. Corley and Carter filed timely notice of appeal.
 
 
 3
 All facts relevant to the alleged payoff and the subsequent discharge are hotly disputed by the parties. Furthermore, as will be explained below, the credibility choices made by the district court must be set aside as infected by application of an erroneous legal standard. The basic areas of dispute are as follows:
 
 1. Prior History of Racial Discrimination:
 
 4
 The parties concede that before Corley and Carter were hired in 1963, the Jackson Police Department had employed no black persons from its formation in 1885. From 1963 until 1970, according to Corley and Carter, the few black officers on the force were openly discriminated against; they were forced to use racially segregated rest rooms and to sit at the back of the room in training academy classes, deprived of many benefits offered to whites, prohibited from arresting whites, and often addressed as "nigger" by their superior officers. When Lavell Tullos became Chief of Police in 1970, he issued a broad policy statement against discrimination, the effects of which are in dispute. The defendants contend that after 1970 there was no discrimination against blacks within the Jackson Police Department; Corley and Carter testified that they continued to be discriminated against, although in a less open manner. By the Consent Decree filed on March 25, 1974, the defendants stipulated to facts demonstrating that their hiring and testing practices continued to have a discriminatory impact after 1970. The Consent Decree also provided "the entry of this Consent Decree . . . shall not constitute an adjudication or an admission of the defendants of any violation of the law".
 
 
 5
 2. Plaintiffs' Challenges to Police Discrimination:
 
 
 6
 In May 1972, Corley and Carter joined several other officers, including another black officer who soon withdrew from the case, in filing a lawsuit against the Police Department challenging changes in the promotion procedure, rank structure, and salary scale instituted under Chief Tullos. The Taylor case, as we will refer to it, was filed in the district court for the Southern District of Mississippi and included several allegations of racial discrimination. In response to the Taylor complaint, approximately 160 Jackson police officers, including the two investigating officers sued in this case, Lieutenant Orr and Captain Bennett, and six black officers, successfully moved to intervene as defendants-intervenors. The Answer of Chief Tullos denied the material allegations of the complaint.[3] Additionally, in June, September, November, and December 1972, Corley and Carter filed charges with the EEOC alleging that they had been denied promotions, transfers, and better job assignments because of their race, and that they had been retaliated against for opposing employment discrimination. In the instant case, Corley and Carter contend that the defendants, particularly Chief Tullos, Police Lieutenant Willie C. Orr, and City Attorney John Stone, knew about their participation in the Taylor case and their filing of charges with the EEOC and wished to retaliate against them for engaging in such activity. The defendants deny having had actual knowledge or retaliatory motives.
 
 3. The Investigation of Corley and Carter:
 
 7
 On October 31, 1972, an informer told Lt. Orr that 10 to 12 months earlier he had witnessed a payoff to Corley and Carter from "a Negro bootlegger on Henry Street" and that this practice was "probably still" going on. A. 1178. Three days later, United States Treasury Agents arrested several bootleggers in the Jackson area, including two black persons, James Henry Johnson and his girlfriend Johnnie Strahan. Johnson told Agent Alan Krohn and Lt. Orr that for two years he had made payments of $2.00 to $5.00 to Corley and Carter in return for protection for his bootlegging operation. According to Johnson, this practice ended in November 1971 when Corley and Carter "were moved away from the downtown area". A. 1179. At the time of these payoffs, Johnson had been doing business at Strahan's apartment on Hamilton Street. In 1972, however, Strahan moved to an apartment at 333 North Roach Street, also in the downtown area. Johnson and Strahan described payoffs in cash and whiskey to other officers, four black and two white, at the Roach Street address.
 
 
 8
 Two weeks after the police received these allegations from Johnson and Strahan, Corley and Carter were transferred from their normal patrol to a walking beat on Farrish Street in the downtown area. At the same time, the police told Johnson and Strahan to contact them as soon as any officers returned for a payoff. The police planned to use a radio transmitter and marked bills to gather conclusive evidence against officers taking payoffs.
 
 
 9
 Corley and Carter allege that their transfer to Farrish Street was an attempt by the Police Department to set them up, noting that no other officer named by Johnson and Strahan was similarly transferred or investigated.[4] The defendants deny any discriminatory effort to entrap Corley and Carter and maintain that the transfer was motivated by considerations unrelated to the investigation of payoffs. They assert that Farrish Street, a predominantly black business and residential section, requires a walking patrol during the Christmas shopping season because of the increase in robberies, burglaries, and purse snatchings.
 
 4. The Alleged Payoff:
 
 10
 On November 27, 1972, Johnson called Lt. Orr to report that Corley and Carter had returned to Strahan's apartment the night before for a payoff. On December 1, Lt. Orr and Captain William E. Bennett went to Strahan's apartment and gave Johnson and Strahan a radio transmitter and ten one dollar bills dusted with a powder which appears orange under fluorescent light. They instructed Johnson and Strahan to call them as soon as Corley and Carter returned for another payoff, and to stall Corley and Carter by asking them to come back later for their money, thus giving the police an opportunity to initiate a stakeout outside the apartment.
 
 
 11
 According to Strahan, Corley and Carter returned to her apartment at 7:00 p. m. on December 2, 1972. She told them that Johnson was not there, asked them to return at 9:00 p. m., and then called Captain Bennett at police headquarters. After a conference with Captain Bennett and two other officers, Lt. Orr called Johnson and told him to turn the radio transmitter on, and then drove in an unmarked car to a position about 90 yards away from Strahan's apartment from which he could observe the front of the building. According to Johnson and Strahan, Corley and Carter returned at approximately 9:30 that evening and were each given five marked one dollar bills.[5] Shortly thereafter, the police picked up Corley and Carter in the area and drove them to headquarters where they were found to possess the marked bills. Two days later they were discharged by Chief Tullos for taking a payoff.
 
 
 12
 Both officers denied having received the marked bills from Johnson on December 2, 1972. They testified that at the time the payoff is alleged to have occurred they were approached by a stranger on Farrish Street who asked them if they had a ten dollar bill or two five dollar bills to exchange for ten ones. It was in making change for this stranger, they testified, that they came to possess the marked bills.
 
 II. THE APPLICABLE LEGAL STANDARD
 
 13
 The parties agree that this case is governed by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In McDonnell Douglas, the Supreme Court explicated "the order and allocation of proof in a private, non-class action challenging employment discrimination" under Title VII. Id. at 800, 93 S.Ct. at 1823. First, "(t)he complainant in a Title VII trial must carry the initial burden of establishing a prima facie case of racial discrimination". Id. at 802, 93 S.Ct. at 1824. The district court in the instant case held that Corley and Carter had established such a prima facie case and we concur in this determination. "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection", id., or, as here, for the discharge. See, e. g., Peters v. Jefferson Chemical Co., 516 F.2d 447 (5th Cir. 1975). In the instant case, if the defendants proved by a preponderance of the evidence[6] that Corley and Carter accepted a payoff on December 2, 1972, an issue which we do not here decide, they might have met their burden of proof.
 
 
 14
 (B)ut the inquiry must not end here. While Title VII does not, without more, compel hiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand, respondent must . . . be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext . . . Petitioner may justifiably refuse to rehire one who has engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races. 411 U.S. at 804, 93 S.Ct. at 1825. (Emphasis added).
 
 
 15
 The Court also described the types of evidence that might suffice to prove "that the presumptively valid reasons for . . . rejection" are "in fact a coverup for a racially discriminatory decision":
 
 
 16
 Especially relevant to such a showing would be evidence that white employees involved in acts against (the employer) of comparable seriousness . . . were nevertheless retained or rehired . . . Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment. Id. at 804-5, 93 S.Ct. at 1825-26.
 
 
 17
 In McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Supreme Court held that McDonnell Douglas applied even where a discharged employee had been accused of a serious criminal offense:
 
 
 18
 While (the employer) may decide that participation in a theft of cargo may render an employee unqualified for employment, this criterion must be "applied, alike to members of all races" and Title VII is violated if, as petitioners allege, it was not. . . . The Act prohibits all racial discrimination in employment, without exception for any group of particular employees, and while crime or other misconduct may be a legitimate basis for discharge, it is hardly one for racial discrimination. Id. at 283, 96 S.Ct. at 2580.
 
 
 19
 The order and burden of proof in a Title VII case where the plaintiff alleges that the misconduct justifying a discharge is in fact a pretext for discrimination has been summarized by this Court recently as follows:
 
 
 20
 (1) (T)he plaintiff must present a prima facie case of racial discrimination; (2) the employer then has the burden of proving, by a preponderance of the evidence, that legitimate, nondiscriminatory reasons existed to support his action; and (3) the plaintiff then has the burden of proving by a preponderance that the employer's articulated reason was a pretext for discrimination. Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1256 (5th Cir. 1977).
 
 
 21
 III. THE STANDARD APPLIED BY THE DISTRICT COURT
 
 
 22
 Considering the record as a whole, including the memorandum opinion of the district court, we are persuaded that the district court failed to apply the three-step rule of McDonnell Douglas to the facts of this case. Rather, the district court stopped at the second step, holding, in effect, that regardless of allegations and evidence of pretext, a legitimate and facially nondiscriminatory reason for discharge suffices to rebut a prima facie case of racial discrimination. This error goes to the heart of the lawsuit and requires reversal.
 
 
 23
 In its memorandum opinion, the district court found as a fact that Corley and Carter demanded and received a payoff from James Johnson on December 2, 1972, and that they were untruthful when they denied having done so on this and earlier occasions involving Johnson and other bootleggers. Although the district court neither expressly stated the legal standard governing its holding nor cited cases following that standard, it explained the legal significance of the facts as found in this manner:
 
 
 24
 The plaintiffs in this suit are seeking to establish their personal and individual rights and have initially made out a prima facie case of liability against these defendants, and the burden of evidence was met by the defendants' proof of the facts and circumstances which clearly and convincingly show the Court that they were discharged by the defendants properly and for good cause. The burden of proof remains on the plaintiffs to prove their claims by the greater weight of the more convincing evidence and they have not done so. . . .
 
 
 25
 This bribery charge is sought by the plaintiffs to be beclouded by collateral questions which do not in the least distract this Court from its very firm conviction that these two black policemen were not discharged because they were black; or because they participated in the Taylor suit, or for any other such reason. . . .
 
 
 26
 These plaintiffs have failed to show this Court by a preponderance of the evidence that their civil rights were violated by these defendants in violation of the Equal Employment Opportunities Act. On the contrary, the proof in this case shows and the Court finds as a fact that these black police officers were duly and properly discharged for good cause.
 
 
 27
 As we interpret this language, the district court confused the issue of whether the employees actually committed the crime on which their discharge was based with the issue of whether the crime committed was used by the employer as a pretext for discrimination, that is, whether the employer applied the same criterion to other employees accused of the same or comparable offenses. The district court's opinion addresses no evidence relevant to pretext, the most important of which indicated that, unlike Corley and Carter, other Jackson police officers named by Johnson and Strahan were neither investigated nor discharged.[7] Under these circumstances, the pro forma conclusion of the district court that the discharges of Corley and Carter were "proper" and "for good cause" is insufficient to assure this Court on review that the proper legal standard regarding pretext was applied in reaching the ultimate conclusion.[8]
 
 
 28
 Comments made by the district judge during the trial reinforce the conclusion that he failed to appreciate the applicability of McDonnell Douglas to this case. In ruling that evidence of Corley's and Carter's character was admissible, Judge Cox stated:
 
 
 29
 Well, I think so, but as I understand the real sharp issue is about whether they did or did not accept a payoff in money from these two bootleggers to protect these bootleggers. A. 159-60.
 
 
 30
 Similarly, at the conclusion of the testimony, Judge Cox stated:
 
 
 31
 And I don't care who gives me the facts, I want to find out what the facts are and there's not but one truth in the case, and that was whether these people were or were not guilty of having accepted a bribe. I don't care who brings that out. A. 1073.
 
 
 32
 Furthermore, at the trial[9] and in his memorandum opinion,[10] Judge Cox stated his strong belief that any police officer guilty of taking payoffs should be discharged. At one point during the trial, while plaintiffs' counsel was attempting to show that the Jackson police used different means to investigate Corley and Carter than they used to investigate other officers similarly accused, Judge Cox stated:
 
 
 33
 I think this was a very unusual investigation when they are having to investigate police officers to see whether or not they are crooked, I think this is pretty close to investigating a judge. You're talking about a police officer acting crooked, if he is crooked I think they were certainly justified in either clearing this fellow or convicting him and getting it over with. This is a very unusual situation . . . A. 653 (emphasis added).
 
 
 34
 It is apparent, then, that the district court construed the issue in this case as whether or not Corley and Carter accepted a payoff as charged, and viewed all evidence relevant to pretext the treatment of other officers similarly accused, the prior treatment of Corley and Carter, the reaction of Police Department officials to Corley's and Carter's charges of racial discrimination in the Taylor case and in EEOC complaints, and the history of racial discrimination within the Jackson police as "collateral questions" raised by the plaintiffs to "becloud" the bribery charge. But under McDonnell Douglas, such evidence is not merely collateral; it is an indispensable element of the plaintiff's burden of proof and must be confronted by the district court in finding for either party. Such evidence does not becloud any issue in this case; rather, it directly addresses and sharply defines a key issue, as developed in McDonnell Douglas and its progeny.
 
 
 35
 In sum, the district court stopped short of the fact finding and legal analysis required for resolution of this case. Its conclusion that Corley and Carter were guilty as charged and were "properly discharged for good cause", without more, cannot be construed as disposing of the pretext issue squarely raised here. We thus hold that the district court failed to heed the mandate of Rule 52(a), Fed.R.Civ.P., regarding specificity in findings of fact and conclusions of law, and that it based its findings and conclusions on a misapprehension of the controlling law. For this reason, the judgment of the district court must be and is reversed.
 
 IV. THE DISTRICT COURT'S FINDINGS OF FACT
 
 36
 Having reversed the judgment of the district court, we must next consider what further proceedings are warranted. Because many material and unresolved factual disputes are involved in this case, appellate resolution without a remand to the district court would be improper. Compare Turner v. Texas Instruments, Inc., supra. Where the district court has failed to make findings of fact and conclusions of law in compliance with Rule 52(a), the usual procedure is to vacate the judgment and remand the case for appropriate findings. Armstrong v. Collier, 536 F.2d 72, 77 (5th Cir. 1976). Conceivably, then, we could remand to the district court for adequate findings on the pretext issue, based on the present or on a supplemented record. Cf. Mladinich v. United States, 371 F.2d 940 (5th Cir. 1967). Under the special circumstances of this case, however, we are persuaded that so limited a remand would serve no useful purpose and that a new trial is necessary. Cf. Carter v. Campbell, 264 F.2d 930, 940-41 (5th Cir. 1959); Johnson v. United States, 256 F.2d 849 (5th Cir. 1958).
 
 
 37
 Under Rule 52(a), the credibility choices of the district court are entitled to great deference on appeal. We base our decision to vacate the district court's findings of fact on the following considerations.
 
 
 38
 A. Application of an Incorrect Legal Standard
 
 
 39
 This Court has long adhered to the rule that "findings induced by or resulting from, a misapprehension of controlling substantive principles lose the insulation of F.R.Civ.P. 52(a) and a judgment based thereon cannot stand". Davis v. Parkhill-Goodloe Co., 302 F.2d 489, 491 (5th Cir. 1962).[11] "It is true that under some circumstances we have held that use of the wrong legal standard may not taint or infect the trial court's findings of fact, so that we remain bound by the clearly erroneous rule. See Smith v. United States, 502 F.2d 512, 519 (5th Cir. 1974)." Turner v. Texas Instruments, Inc., supra, 555 F.2d at 1256 n.5. In this case, however, where each party offered substantially divergent factual accounts requiring difficult credibility choices on virtually every subsidiary fact, we hold that the district court's application of an incorrect legal standard necessarily tainted its findings of fact.
 
 
 40
 As we explained in McGowan v. United States, 296 F.2d 252, 254 (5th Cir. 1961):
 
 
 41
 (T)he fact findings of the District Judge come here with the buckler and shield of F.R.Civ.P. 52(a), 28 U.S.C.A. But because the findings carry such weight, we must be certain that in making credibility choices particularly of the basic kind in which the question revolves around the selection of one of two divergent statements the trier of fact has evaluated them in the light of proper legal standards.
 
 
 42
 The district court found that Corley and Carter accepted a payoff from Johnson on the night of December 2, 1972. We cannot be certain that this finding was not induced by the district court's application of erroneous substantive principles. Except for the uncontested fact that these two officers possessed the marked dollar bills when they were picked up by the police that night, virtually every subsidiary fact on which the payoff finding was based involved "the selection of one of two divergent statements". The following is a sampling of the credibility choices that the district court had to make:
 
 
 43
 1. Johnson and Strahan testified that they gave the ten marked bills to Corley and Carter at Strahan's apartment at approximately 9:30 p. m. on December 2, 1972. Corley and Carter testified that they received these bills from a black man, unknown to them, whom they encountered on Farrish Street that night. They also denied having visited Strahan's apartment that night.
 
 
 44
 2. Two witnesses, Hules McDougles and Floyd Whitfield testified that they witnessed Corley and Carter exchange money with a black man, whom they could not identify, on Farrish Street that night. The opinion of the district court does not mention McDougles and Whitfield. We assume that the district court, for reasons not stated, rejected their testimony.
 
 
 45
 3. On the night of December 2, 1972, Lt. Orr positioned himself in an unmarked police car in front of Strahan's apartment on North Roach Street. He arrived at this position at approximately 8:30 p. m. and remained there until approximately 10:00 p. m. when he received word over his radio that the payoff had been made. The purpose of this stakeout was to witness Corley and Carter going into Strahan's apartment. Orr testified that although he could see people walking on North Roach Street in the darkness, he did not see Corley and Carter or anyone in a police uniform. A. 629-31. On the other hand, Strahan testified that, while walking toward her apartment, she saw Corley and Carter "coming down the street". A. 848, and Johnson recalled that Strahan told him "they was coming down the street". A. 811. Presumably, the district court concluded that Lt. Orr was mistaken.
 
 
 46
 4. Both Corley and Carter testified that they had never accepted gratuities from bootleggers in exchange for police protection. To impeach this testimony, the defendants adduced testimony from Mrs. Mattie Mae Chapman, a bootlegger and pardoned murderess, that "to keep the law off of me" she gave Corley a diamond ring and a pistol and Carter a shirt and a pistol. She could not remember the dates of these four separate transactions, but she estimated that they took place in 1970. A. 914-16. Both officers denied Mrs. Chapman's allegations and Corley implied that she may have been confused in one case because in 1966 or 1967 he was present when Mrs. Chapman gave a ring to another officer, deceased at the time of the trial. The district court believed Mrs. Chapman's account, dismissing Corley's and Carter's denials. However, a central part of the rationale for making this credibility choice that Mrs. Chapman "testified against these officers in the face of threats as to her safety" is clearly erroneous.[12]
 
 
 47
 The credibility choices in this case were further complicated by suggestions that extra-judicial attempts to influence the fact finding process had been made.[13] We assume that the district court properly considered these attempts in its evaluation of the evidence. As a result, however, there was a greater risk that the facts ultimately found would be tainted by the court's misapprehension of the controlling law. Here the district court could not rely on a core of undisputed facts. It had to pick and choose among widely divergent accounts, its choice guided by nuances and subtleties which are lost in the cold print of a transcript. We are unable to conclude that the district court would have made the same credibility choices in finding that the payoff took place had it appreciated the significance of the pretext issue and not assumed that the controlling question in the case was whether Corley and Carter were guilty as charged.[14]
 
 B. Lack of Care by the Fact Finder
 
 48
 The findings of fact mandated by Rule 52(a) "must be sufficient in detail and exactness to indicate the factual basis for the ultimate conclusion reached by the court". Lettsome v. United States, 434 F.2d 907, 909 (5th Cir. 1970). See also Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 515 (5th Cir. 1969). A major purpose of this rule "is to engender care on the part of the trial judge in ascertaining the facts". Golf City, Inc. v. Wilson Sporting Goods, Co., Inc., 555 F.2d 426, 432 (5th Cir. 1977), citing United States v. Forness, 125 F.2d 928, 942-43 (2d Cir. 1942), cert. denied, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764. Without deciding whether each of the district court's findings of fact comply with Rule 52(a), we are satisfied that the rule's goal of encouraging care in the fact finding process was not achieved in this case. We base this conclusion on statements of fact by the district court which are either misleading or inaccurate.[15]
 
 
 49
 1. In rejecting Corley's and Carter's account of how they came into possession of the marked bills, the district court, in its memorandum opinion, stated:
 
 
 50
 These plaintiffs had different versions of their concocted story and the Court was completely convinced that their versions of the incident were merely figments of their imaginations and unworthy of belief.
 
 
 51
 In their testimony at the trial, Corley and Carter told essentially the same story that they received the marked bills while making change for an unknown black man on Farrish Street. They also testified that on the night of the incident they told their superiors that they obtained the bills by making change. A. 210 (Corley); 293 (Carter). Lt. Orr and Captain Bennett contradicted this testimony. They recalled that on the night of the alleged payoff Corley told them that he was given five one dollar bills by "Tommy Jones", who owed him money, A. 598-99; 705-6, and that Carter stated he had gotten the five ones in change after he purchased something in a store. A. 601; 710.
 
 
 52
 In finding that the plaintiffs "had different versions" of their story, the district court apparently believed the testimony of Lt. Orr and Captain Bennett over that of Corley and Carter, but it did not undertake to explain the reasons for this credibility choice. Similarly, in finding that this "concocted story" was a figment of Corley's and Carter's imaginations, the district court failed to account for the testimony of two corroborative witnesses, McDougles and Whitfield. We are left to assume that the court did not believe their testimony, but we are furnished no explanation for the choice.
 
 
 53
 2. In its memorandum opinion, the district court, perhaps indirectly addressing the pretext question, indicated that the Jackson Police learned of Corley's and Carter's activities as a result of an independent federal investigation of bootleggers in the area and not through any probing of their own:
 
 
 54
 The facts and circumstances in this case revealed to this Court that these defendants had no part in uncovering this very unwholesome situation, and did nothing discriminatorily against these black plaintiffs on account of their participation in the Taylor case. Federal Agent Kron (sic) who had been with the Alcohol, Tobacco & Firearms unit of the United States Treasury Department for sixteen years accidentally discovered these facts which were revealed to the authorities of the municipality and were checked to ascertain the accuracy of the payoff relationship which existed between these two black police officers and the two notorious bootleggers in Jackson, as stated.
 
 
 55
 This account is inaccurate. The Jackson Police first learned of allegations that Corley and Carter were accepting payoffs not from Agent Krohn but from a police informer with whom Lt. Orr spoke on October 31, 1972. A. 1178. Three days later, after Johnson had been arrested on federal charges, he was questioned by Agent Krohn and, at first, he denied having paid off any policemen. Upon being pressed by Krohn, Johnson changed his story and named Corley and Carter.[16] At this point Krohn ordered Johnson to "hold it right there" while he called in Lt. Orr. A. 549-50; 565-75. Krohn told Lt. Orr that there was something he thought Orr should hear and brought him into the interrogation room with Johnson. A. 583. Johnson was upset, however, and would say nothing about police officers with Krohn present. A. 1179. Lt. Orr took Johnson to a separate room and questioned him alone. It was during this interrogation that he named not only Corley and Carter but six other officers to whom he had made payoffs in money and liquor. Significantly, Johnson stated that the payoffs to Corley and Carter had ended a year earlier and that he was currently paying other officers whose names he furnished.
 
 
 56
 The district court's account is also misleading because it does not reflect that Johnson named other officers in addition to Corley and Carter. Without this information, one is left to assume that the investigation conducted by the police did not single out Corley and Carter for discriminatory treatment. The Jackson Police maintained that they investigated every officer named by Johnson. A. 657-59. However, the record does not disclose the type of investigation conducted into the charges against any officers other than Corley and Carter. No file was kept relating to these other investigations, A. 600-1, and only Corley and Carter were transferred to a patrol within walking distance of Strahan's apartment. Evidence in the record[17] suggests that the primary purpose of the transfer was to facilitate the investigation against Corley and Carter, although both Chief Tullos and Lt. Orr denied such a motive. A. 616-29 (Orr); 946-47, 968 (Tullos). The defendants' explanation for the failure to discipline any other officers named by Johnson "None of them ever returned (to Strahan's apartment), therefore we had no way of making a case against them", A. 664 (Orr) supports a finding that police regulations were discriminatorily enforced against Corley and Carter. We note this possible construction of the evidence not to suggest the appropriate finding in this case but rather to demonstrate the need for careful and reasoned credibility choices.
 
 
 57
 In summary, then, we find that (1) resolution of this case hinged on difficult credibility choices, (2) application of incorrect substantive principles inevitably tainted the district court's findings of fact, and (3) the findings recorded in the district court's memorandum opinion were not carefully made, in violation of the salutary purpose of Rule 52(a). On this basis, we hold that a remand solely for the purpose of making additional findings of fact and conclusions of law would not suffice to rectify the errors of the district court and that a new trial is required.
 
 
 58
 The judgment of the district court is reversed and remanded for a new trial in accordance with the principles explicated in this opinion.
 
 
 59
 REVERSED and REMANDED.
 
 
 
 [1]
 Civil Rights Act of 1964, Title VII, 42 U.S.C. §§ 2000e et seq
 
 
 [2]
 Pursuant to 42 U.S.C. § 2000e-5(f)(1)
 
 
 [3]
 After their dismissal, Corley and Carter withdrew from the Taylor case and their claims of racial discrimination were stricken from the complaint. Ruling on an interlocutory appeal from the district court's denial of defendants' motion to dismiss, a panel of this Court held that absent the discrimination counts of the black plaintiffs, the district court lacked subject matter jurisdiction. Taylor v. City of Jackson, 487 F.2d 213 (5th Cir. 1973)
 
 
 [4]
 Corley and Carter also argue that no disciplinary action was taken against 11 other officers named by an anonymous informer to Lt. Orr on October 31, 1972. However, these 11 officers were accused of drinking on the job, an offense clearly distinguishable from accepting a payoff
 
 
 [5]
 The radio transmitter did not function properly and no intelligible conversations came over it. Also, Lt. Orr did not observe Corley and Carter on Roach Street or going into Strahan's apartment
 
 
 [6]
 In Turner v. Texas Instruments, Inc., 555 F.2d 1251 (5th Cir. 1977), we held that the employer bears the burden of proving the nondiscriminatory reasons for his actions by a preponderance of the evidence
 
 
 [7]
 The only portion of the district court's opinion which might conceivably relate to the pretext issue is a paragraph in which the district court finds that the Jackson police "had no part in uncovering this very unwholesome situation". However, this finding is clearly erroneous, as is explained in Part IV. B. 2. of this opinion, infra. The district court's discussion of this point is also misleading because it omits reference to the six other officers named by Johnson and Strahan. Had the court considered this evidence under the McDonnell Douglas test, it might have found pretext in that the two white officers named were not similarly treated, in violation of 42 U.S.C. § 2000e-2(a), or that all of the others named, two white and four black, who had neither participated as plaintiffs in the Taylor case nor filed charges with the EEOC, were not similarly treated, in violation of 42 U.S.C. § 2000e-3(a)
 
 
 [8]
 Were we not convinced that the district court applied the wrong substantive principles, we would nevertheless be obligated to vacate the judgment of the district court for failure to comply with Fed.R.Civ.P. 52(a), requiring that "(i)n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon". Prior decisions of this Court leave no doubt that Rule 52(a) proscribes conclusory findings which do not indicate the factual basis for an ultimate conclusion. Fortner v. Balkcom, 380 F.2d 816, 821 (5th Cir. 1967). In Hydrospace-Challenger, Inc. v. Tracor/Mas, Inc., 520 F.2d 1030 (5th Cir. 1975), we criticized a memorandum opinion comparable to that in the instant case:
 Many of the findings are couched in conclusory terms. Some were announced solely as ultimate findings without support which clearly reflected a choice between conflicting accounts of events or between alternate legal interpretations of those events. This court cannot be left to guess. The findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied. Id. at 1034.
 See also Echols v. Sullivan, 521 F.2d 206 (5th Cir. 1975).
 Here, if we assume that the district court applied the McDonnell Douglas pretext test, we could only speculate as to whether it correctly applied that test. The district court made no findings of fact relevant to the pretext issue and it is not our function to make credibility choices. Furthermore, both parties "are entitled to a trial of the hotly contested inferences by a court consciously applying the correct legal standards. They will not have had such a trial merely by our undertaking to say that had the standard been applied, the evidence would have warranted the result". Carter v. Campbell, 264 F.2d 930, 941 (5th Cir. 1959).
 
 
 [9]
 A. 486: " . . . I would think that would be so completely reprehensible for a police officer to be taking a payoff that if they didn't run him off I would. I wouldn't care what color he was, whether he was white or black or green or what color he was. I would have no discrimination whatsoever in that"
 
 
 [10]
 "We must not lose sight of the bribery incident of December 2, 1972 and be led away from this very important incident insofar as the public and this municipality is concerned. Bribery is not a condoned or pardonable offense for any officer regardless of his personal civil rights and regardless of his color"
 
 
 [11]
 See also Johnson v. Goodyear Tire and Rubber Co., 491 F.2d 1364, 1372 n.20 (5th Cir. 1974); Rowe v. General Motors Corp., 457 F.2d 348, 356 n.15 (5th Cir. 1972); United States v. Richberg, 398 F.2d 523, 530 n.4 (5th Cir. 1968); Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967)
 
 
 [12]
 On direct examination, Mrs. Chapman testified as follows:
 Q. Did they come around to your house after they were fired?
 A. Yes sir.
 Q. Can you tell me what they said to you if they said anything?
 A. He said don't know nothing if anybody come around questioning you Mattie, don't you know nothing. I said okay.
 Q. Who told you that you were not to know nothing?
 A. Charlie. A. 926.
 No evidence indicates that Mrs. Chapman's safety was ever threatened. Additionally, the transcript suggests that the district court may have rejected Corley's and Carter's denial of prior payoffs before Mrs. Chapman's impeaching testimony was taken. When plaintiffs' counsel objected to Mrs. Chapman's testimony, counsel for defendants pointed out that Corley and Carter had testified that they had never received "any gratuity from a known bootlegger". The district judge responded:
 They certainly did and pretended to be completely shocked, astonished and surprised that such a thing would happen, and I would like to hear under oath hear some person who says she has given these officers gratuities, I mean in the form of money. A. 913.
 
 
 [13]
 As indicated in note 12, supra, Mrs. Chapman testified that Corley and Carter told her to "know nothing" if she were questioned. Gordon D. Gibson, an investigator for the EEOC and a preacher, testified that Lt. Orr, whose reaction to the EEOC's investigation of Corley's and Carter's discharge "became ultimately quite hostile", A. 437, told Gibson in early 1973 "don't fuck with our witnesses", apparently in reference to Johnson and Strahan. A. 441. Lt. Orr denied having used the language attributed to him by Gibson but confirmed the incident, explaining that he felt Gibson was trying to influence the testimony to be given by James Johnson. A. 611-12. Johnson, a 63 year old black man with a fourth grade education and "daddy of the bootleggers" in Jackson, A. 797, was especially vulnerable to improper pressures. At the trial, he steadfastly refused to identify the other police officers to whom he had made payoffs in money and whiskey:
 I just tell you now, lawyer, I just think I am going to tell you how I feel about it, I think you are going too fer (sic) into my business now talking about the police, I live here, and stuff go on I don't want to know about it unless'n they come there and want something and then I know about it. A. 798.
 The district court upheld Johnson's refusal to testify on this point and, addressing plaintiffs' counsel, stated:
 Like he says, he has got to live here and I don't want him harrassed, (sic) I tell you right now I don't want you or any of your crowd or anybody connected with you to molest this fellow at all about his testimony. A. 801.
 
 
 [14]
 Although subject to other interpretations, an exchange between the district judge and counsel for defendants at the end of the trial suggests that the judge assumed that the Jackson Police Department could not legally have fired Corley and Carter if it mistakenly but in good faith believed that those officers had accepted a payoff. A. 1073-76. This is not a correct statement of law under Title VII. We have recently held that where an employer wrongly believes that an employee has violated company policy, it does not discriminate in violation of Title VII if it acts on this belief. Turner v. Texas Instruments, Inc., supra, 555 F.2d at 1256
 
 
 [15]
 We note that in the three months that elapsed between the trial and the filing of the district court's memorandum opinion, the testimony at the trial had not been transcribed
 
 
 [16]
 Agent Krohn repeatedly asked Johnson if he had been paying off the police and Johnson, upset and crying, repeatedly denied that he had. Krohn accused Johnson of lying and stated, according to Johnson, that if Johnson did not stop lying he would never do business again. Finally, Johnson admitted to making payoffs. A. 565-74 (Krohn); 791-95 (Johnson). The district court's finding that Krohn "accidentally discovered these facts" is clearly erroneous
 
 
 [17]
 Exhibit P-4 (report of an interview with Chief Tullos on December 4, 1972, by Gordon Gibson); Exhibit D-4, p. 22 (transcript of hearing before the Jackson Civil Service Commission on January 11, 1973, testimony of Lt. Orr)