**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Plaintiff,**

v.

**RYDER/P\*I\*E NATIONWIDE, INC., Defendant.**

**No. C–C–85–562–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Dec. 10, 1986.

Michael H. McGee, Michel Vaughan, E.E. O.C., Charlotte, N.C., for plaintiff.

E. Osborne Ayscue, Jr., H. Landis Wade, Smith, Helms, Mulliss & Johnston, Charlotte, N.C., Peter Reed Corbin, John E. Duvall, Corbin & Dickinson, Jacksonville, Fla., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER Chief Judge.

Plaintiff Equal Employment Opportunity Commission ("EEOC") filed this action on September 30, 1985, complaining that the Defendant Ryder/P*I*E Nationwide, Inc. ("Ryder") discriminated against one Linda L. Smith ("Smith") on the basis of her sex when Ryder refused to hire Smith as a tractor-trailer driver at Ryder's terminal in Charlotte, North Carolina. The trial was heard before the undersigned without a jury on November 13, 1986 in Charlotte, North Carolina. The EEOC was represented by Attorneys Michel D. Vaughn and Michael McGee. Ryder was represented by Attorneys H. Landis Wade, Jr., Peter Reed Corbin and John E. Duvall. After a full trial of the matter, the Court, having carefully considered the testimony and the exhibits presented, enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) The EEOC is an agency of the Government of the United States of America charged with the administration, interpretation and enforcement of Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and is expressly authorized to bring civil actions pursuant to Section 706(f)(1), 42 U.S.C. § 2000e–5(f)(1).

(2) Smith is a white female citizen of the United States and a resident of Charlotte, North Carolina.

(3) Ryder is a Florida corporation doing business in North Carolina as a regulated common carrier in the business of transporting general commodity freight. Ryder, at all times material to this action, operated a terminal facility in Charlotte, North Carolina.

(4) Ryder, at all times material to this action, employed more than 15 employees and is an employer engaged in an industry affecting commerce within the meaning of Section 701(b) of Title VII.

(5) The EEOC alleges that Ryder discriminated against Smith on the basis of her sex in violation of Title VII when it failed to hire Smith for a tractor-trailer truck driver position. Ryder contends that it declined to hire Smith for legitimate, nondiscriminatory reason, to wit, because she was unable to perform a basic function of the job, the handling of a dolly converter or Jifflox, and because there were more qualified applicants.

(6) On September 20, 1978, Smith applied for a position as a tractor-trailer driver with Ryder at its Charlotte facility. At that time, John Britt ("Britt"), safety manager for Ryder and responsible for the testing, hiring and training of applicants and employees, mentioned to Smith that she was too small. Thomas E. Houser ("Houser"), manager of Ryder's Charlotte facility, told Smith to fill out and submit an application.

(7) Houser was charged with the ultimate responsibility of hiring and firing transportation department applicants and employees, including tractor-trailer drivers. It was Houser's practice to call in applicants in whom he was interested. In this case, however, Smith called Houser to inquire about her application and he told her

to come to the Charlotte terminal for testing.

(8) On October 19, 1986, Smith arrived at the Charlotte terminal for testing. At that time, she weighed 113 pounds, and stood five feet, six-and-one-half inches tall. She had six-and-a-half year's experience of tractor-trailer driving, all of which was as a relief driver with her husband helping him with the driving, except for a period in 1980 and 1981 when her husband had two trucks and she drove one and he drove the other. The Plaintiff never operated a truck with double trailers and never was involved with the operation of a Jifflox or dolly converter before her application to the Defendant.

(9) Ryder required the following written qualifications for tractor-trailer drivers: (1) a reasonable amount of driving experience under conditions similar to what would be expected by working for Ryder; (2) a current chauffeur's license with no more than three chargeable accidents within a three-year period preceding the date of application; (3) a driving record which does not indicate a bad safety record during a five-year period immediately preceding the application; (4) be physically qualified; (5) meet all requirements described in the Federal Motor Carrier Safety Regulations; (6) pass road and written tests; and (7) have no felony convictions in the past eight years, no dishonorable discharge from the armed services, and no unsatisfactory past work record. Ryder had no written weight or height requirements.

(10) Smith passed the written tests which were administered to her by Britt.

(11) Prior to taking the road test, Smith, and four other applicants, all male, were escorted to the terminal yard where Britt demonstrated the use of the Jifflox.

(12) The Jifflox is a mechanism used to connect two trailers, commonly referred to as doubles, to each other so that they can be pulled by one trailer. It weighs approximately 2,950 pounds; its tongue weight is 256 pounds level and 310 pounds resting on its nose.

(13) Britt explained the procedure in using the Jifflox to the group and the group went through hooking and unhooking the Jifflox. Britt asked Smith to pick the tongue of the Jifflox up; when she did, it started rolling away from her until the other applicants grabbed it. When Smith picked the Jifflox up, it was sitting level on its drop leg. Britt did not ask any of the other applicants to pick up the Jifflox by themselves.

(14) After the Jifflox demonstration, Britt administered the road tests to the applicants. Smith passed the road tests, although she did experience some problems with the clutch.

(15) While taking the road tests, Britt told Smith that he was concerned about her size and that the Jifflox was heavy and that she could get hurt while using it. Britt also stated that Smith was about the same stature of his wife and that he would not want his wife in terminals at night alone.

(16) On October 26, 1983, Houser informed Smith that she would not be hired because other applicants had been hired who were more qualified.

(17) With respect to Smith's application, testimony indicated that the form had been in use for a number of years before North Carolina allowed the use of double trailers. Thus, the form was not drafted with consideration for doubles or the Jifflox. Britt wrote the word "Jifflox" under the section, "Use of Special Equipment," on Smith's application form. Britt testified that this did not indicate Smith performed satisfactorily on the Jifflox, but only that he went through the demonstration with her. Immediately under the section for "Use of Special Equipment," the form's section entitled "Remarks" states that "She is small and had a hard time with the clutch." Britt indicated on the form that Smith's "General Performance" was satisfactory. [Plaintiff's Exhibit No. 7.]

(18) The undisputed testimony indicated that Smith had no prior experience with the Jifflox at the time she applied with Ryder, and that none of the other applicants had prior experience with the Jifflox. Britt testified that the other applicants were, in his opinion, more qualified overall, despite Smith's satisfactory general performance and experience. All of the applicants included in Defendant's Exhibits 17 through 29 had many more years experience than Smith, with the exception of one who had only three years. Those applicants also had many hundreds of thousands of miles of driving experience.

(19) Based on Smith's written application, Houser testified that nothing indicated she was not qualified for the job. Houser further testified that he did not hire Smith because there were more applicants who were more qualified and because Britt recommended against hiring her based upon her physical size and her inability to handle the Jifflox and upon her driving which was not as good as the other applicants.

(20) On December 5, 1983, Smith filed a charge of discrimination with the EEOC. The EEOC served notice of the charge on Ryder and after an investigation, the EEOC issued a Letter of Determination in which it found reasonable cause to believe that the allegations were true. Following the failure of efforts to conciliate, EEOC filed this action on September 30, 1985.

(21) In justifying its action, Ryder introduced undisputed evidence that in July 1983 Ryder Truck Lines, Inc. and Pacific Intermountain Express merged. The companies designed the merger to coincide with the effective date of the Federal Land Transportation Act of 1983 (the "Act") which allowed the use of double trailers on the entire highway system. Prior to the Act, North Carolina and many other states prohibited the use of double trailers within their boundaries.

(22) Following the merger, Ryder's Charlotte facility was substantially expanded and numerous new tractor-trailer drivers were hired. Mark Gardner ("Gardner"), Ryder's safety director, testified that inside of approximately three or four days, Ryder's four thousand employees on the East

Coast were exposed to doubles for the first time. Ryder's percentage of doubles in its Charlotte fleet at the time of this trial was 80 to 90 percent. There was no evidence presented as to the percentage of doubles used when Smith applied.

(23) There was evidence, however, that Ryder was implementing the use of doubles on the East Coast in a rapid fashion because they provide more loading space and greater convenience for city loads. Thus, after July 1983, Ryder had a strict policy that the operation of the Jifflox was a one-person job, and there was testimony that this requirement was posted in terminals.

(24) Although Ryder maintained no specific height or weight requirements nor any requirement that drivers pick up the Jifflox while its tongue rested on the ground, testimony showed that drivers needed to be a sufficient physical size and strength to pick up the Jifflox by themselves while its tongue rested level on its drop leg. Further, Ryder introduced testimony that drivers were expected to be able to push the Jifflox unassisted 20 to 25 feet to hook it up to trailers at the time Smith applied; and that even today, after improvement of equipment and procedures, drivers still have to physically handle the Jifflox a small distance.

(25) Drivers often have to take loads to satellite terminals at odd hours by themselves and have to be able to handle the Jifflox unassisted. If the driver cannot handle the Jifflox unassisted, then the driver is ineffective to operate within Ryder's fleet.

(26) Ryder's requirement that its drivers be able to handle the Jifflox unassisted was, in part, based upon its policy against drivers jack-knifing their rear trailers for hooking and unhooking. The landing gear of the rear trailers have no structural support for lateral movement, and if lateral movement is imposed, the trailer can fall. Thus, Ryder instructed its drivers to position its trailers to alleviate the risk of lateral movement in hooking and unhooking.

(27) Gardner testified that approximately 80 percent of the drop legs used to support the Jifflox were broken; and one of the EEOC's witnesses and Ryder driver, Grady Little ("Little"), testified that drivers for Ryder had experienced many accidents in using the Jifflox.

(28) Little, and other witnesses for the EEOC, testified that their practice in using the Jifflox frequently involved the assistance of others and that it was the practice of drivers to back up their trailers as close to the Jifflox as possible, frequently jack-knifing their trailers, to avoid excessive lifting. Little and Ray Tucker ("Tucker"), another Ryder driver, testified that if they had trouble in hooking up the Jifflox, they would call Ryder's dispatcher for assistance. Training on the Jifflox for Little, Tucker, and other drivers was administered by Ryder shortly after they were hired.

(29) Little testified that, although he often times received assistance in hooking up the Jifflox, there were many occasions when he had to hook it up by himself. Little was aware of the policy that all tractor-trailer drivers were expected to be able to handle the Jifflox by themselves. At the time of trial, Little had recently been injured in handling a dolly converter, although he considered himself a little above average in using the converters.

(30) Tucker corroborated Little's testimony in stating that he handled the Jifflox by himself on a regular basis and that he had a lot of problems in doing so when he first started using it; Tucker also considered himself above average in handling the Jifflox.

(31) Shirley Harris ("Harris"), a former driver for Ryder out of its Ohio facilities, testified that it was her practice to jack-knife her trailer as close as possible to the Jifflox. She would then use a long crowbar and use it for leverage to pick up the converter gear and hook it up. Harris never pushed or pulled the Jifflox but used her truck to do all the heavy work. On many occasions Harris used the Jifflox this way by herself at satellite terminals.

(32) All of the EEOC's witnesses testified that while employed with Ryder they were never aware of any policy against jack-knifing their trailers and that jack-knifing was a commonly used practice.

(33) Harris, who stands five-foot-six-inches tall and weighed approximately 145 pounds when she went to work for Ryder in August of 1983, was only required to pass road tests in applying for a driver's position. At that time she had four years' prior experience in handling doubles as a tractor-trailer driver.

(34) Harris further corroborated the other prior testimony in testifying that she was aware of Ryder's policy that handling the Jifflox was expressly a one-person job, and that such policy was written. The policy provided that in rare circumstances a driver could get assistance in hooking up the Jifflox.

(35) In addition to Harris, Ryder has hired other female drivers around the country and, at the time of trial, Ryder employed about a dozen female drivers in its fleet of approximately 2,230 drivers. Houser testified that of the over 300 applications filed for the Charlotte facility from 1983 to 1984, only three females, including Smith, applied.

(36) The uncontested testimony of Britt was that, although he had never recommended the hiring of a female driver at the Charlotte terminal, he had recommended females at other terminals before double trailers were utilized on the East Coast.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1343 and Title VII of the Civil Rights Act of 1964, Section 706(f), as amended, 42 U.S.C. § 2000e–5(f).

(2) Ryder is subject to the jurisdiction of this Court and is an "employer" as defined by 42 U.S.C. § 2000e(b).

(3) Title VII, 42 U.S.C. § 2000e–2(a)(1) makes it an unlawful discriminatory practice for an employer to fail to hire an individual because of such individual's sex.

(4) The Court notes that the law does not read that a person may not be refused employment *if* she is female; under the law, the EEOC must prove by a preponderance of the evidence that she was not hired *because* she was female. *See, e.g., Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); and *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

(5) The EEOC has the initial burden of establishing a *prima facie* case of discrimination. *Texas Department of Community Affairs v. Burdine, supra* 450 U.S. at 252–53, 101 S.Ct. at 1093; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793, 802, 93 S.Ct. 1817, 1820, 1824, 36 L.Ed.2d 668 (1973). Under the proof scheme set forth in *McDonnell Douglas Corp. v. Green*, a *prima facie* case can be established by showing:

(1) the complainant belongs to a protected class;

(2) the complainant was qualified for the job;

(3) though qualified, the complainant was rejected; and

(4) the employer continued to seek applicants with the complainant's qualifications.

*See, also, Smith v. University of North Carolina*, 632 F.2d 316 (4th Cir.1980).

(6) Put another way, the EEOC may establish a *prima facie* case of discrimination by showing

> actions taken by an employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on discriminatory criterion under the Act."

*Furnco Construction Corp. v. Waters, supra* 438 U.S. at 576, 98 S.Ct. at 2949, (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S.

324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed. 396 (1977)).

■ (7) If the EEOC succeeds in proving a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the challenged action. *Texas Department of Community Affairs v. Burdine, supra* 450 U.S. at 253, 101 S.Ct. at 1093. This burden is merely a burden of production of evidence and the burden of persuasion does not shift to Ryder, as that burden always rests with the EEOC. *Id.* at 256–57, 101 S.Ct. at 1095.

(8) Should Ryder carry its burden, then the EEOC must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by Ryder were not its true reasons, but were a pretext for discrimination. To show pretext, the EEOC must show that Ryder's reasons were fabricated, that is, that a discriminatory reason more likely motivated Ryder or that Ryder's proffered reason is unworthy of credence. *Ross v. Communication Satellite Corp.,* 759 F.2d 355 (4th Cir.1985).

■ (9) The trier of fact, in a Title VII case, may rely on inference rather than direct evidence of intentional discrimination, but discriminatory intent must be proved by a preponderance of the evidence, whether direct, circumstantial, or otherwise. *Id.; Board of Trustees of Keene State College v. Sweeney, supra.*

■ (10) The EEOC did not prove by a preponderance of the evidence that Ryder's reason for not hiring Smith was pretextual merely by claiming that Ryder did not make a good decision or was mistaken. The law is clear that an employer's reason for his action may be a good reason, a bad reason, a mistaken reason, or no reason at all, as long as the decision was not based on sex or other unlawful discriminatory criteria. *Sanchez v. Texas Commission on Alcoholism,* 660 F.2d 658, 662 (5th Cir. 1981); *Jefferies v. Harris County Community Action Association,* 615 F.2d 1025, 1036 (5th Cir.1980); *Corley v. Jackson Po-*

*lice Department,* 566 F.2d 994, 1003 n. 14 (5th Cir.1978); *Silberhorn v. General Iron Works Co.,* 584 F.2d 970, 972 (10th Cir. 1978); *Timms v. Board of Education,* 452 F.2d 551 (8th Cir.1971). Ryder is not required to prove that its decision was correct. This Court need only determine that Ryder believed in good faith that Smith's qualifications were not as good as the other applicants', that the asserted reason for the action was not a mere pretext for discrimination. *Compare Moore v. Sears Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982); *Jones v. Los Angeles Community College District,* 702 F.2d 203, 205 (9th Cir.1983). Further, Ryder's evidence need only be legally admissible and not intrinsically unworthy of acceptance, and the reason advanced a legitimate one. *Monroe v. Burlington Industries,* 784 F.2d 568, 571–72, (4th Cir.1986); *Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 244 (4th Cir. 1982).

■ (11) The decision as to what criteria shall be considered in making employment decisions lies fully in the hands of the employer, as long as discriminatory criterior are not applied. *Bay v. Goodyear Tire & Rubber Co.,* 23 Empl.Prac.Dec. (CCH) ¶ 30, 903 at p. 15673 (S.D.Tex.1980), *aff'd* mem. 638 F.2d 1233 (5th Cir.), *cert. denied,* 454 U.S. 862, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981).

■ (12) The claimant's general assertion that she was not hired because of her sex is insufficient as a matter of law to show that the stated reason for the decision is pretextual. *Munoz v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators,* 563 F.2d 205 (5th Cir.1977); *Patterson v. General Motors Corp.,* 631 F.2d 476 (7th Cir.1980). Also, the EEOC cannot rebut the stated reason of Ryder for not hiring Smith merely by showing that she meets the minimum qualifications for the job and believes she can perform satisfactorily. *Compare Smith v. Flax,* 618 F.2d 1062 (4th Cir.1980); *Jackson v. City of Killeen,* 654 F.2d 1181 (5th Cir.1981); *Pat-*

*mon v. Van Dorn Co.,* 498 F.2d 544 (6th Cir.1974).

(13) The Court concludes that under *McDonnell Douglas v. Green, supra,* the EEOC has made a *prima facie* showing that Ryder refused to hire Smith because of her sex. Smith, a female, applied for the position of tractor-trailer driver, the application form indicated that she met the minimal qualifications for the job despite her small physical size and problem with the clutch, Ryder rejected Smith and continued to seek and hire applicants to fill its tractor-trailer driver positions.

(14) The Court further concludes, however, that Ryder offered substantial evidence that its refusal to hire Smith was based upon legitimate nondiscriminatory business considerations. At the time Smith applied, Ryder had recently implemented the use of doubles and the Jifflox within its East Coast fleet. Ryder's express policy was that the handling of the Jifflox was a one-person job; two of the EEOC's witnesses testified that they were fully aware of that policy and all of the EEOC's witnesses testified that they handled the Jifflox by themselves on a regular basis, particularly when loading and unloading at satellite terminals during odd hours. If a driver was unable to handle a Jifflox unassisted at satellite terminals during odd hours, then that driver would be ineffective to operate within the fleet. It was thus reasonable for Ryder to require that its drivers be of a sufficient physical size and strength to pick up the Jifflox by themselves; this requirement is no less valid just because Ryder failed to maintain specific written height and weight requirements or employ an application form which included a specific section on the ability to handle the Jifflox.

(15) Houser's decision not to hire Smith was based on legitimate nondiscriminatory business considerations in that he believed in good faith that there were more qualified applicants and because Britt recommended against hiring her because of her physical size and inability to handle the Jifflox and upon her driving which was not as good as some of the other applicants. Although Smith was the only applicant who was asked to pick up the Jifflox unassisted, the Court concludes that the EEOC has not shown that Britt's request was discriminatorily motivated since Smith, at 113 pounds, was the only applicant who he was concerned for in handling a heavy piece of equipment such as the Jifflox. The EEOC has not shown that Britt made any assumptions based on Smith's gender; and there is no prohibition against making an assumption based on physical size. Indeed, Britt's apprehensions were realized when the Jifflox began to roll away from Smith until the other applicants moved in and grabbed it. Exhibits 9 and 10 of the EEOC clearly indicate that the Jifflox is a substantial piece of equipment, worthy of due precaution and respect.

(16) Britt's recommendation and Houser's ultimate decision were further supported by the fact that Smith had a problem with the clutch during her road tests and that in Britt's and Houser's opinions, there were other applicants who were, overall, more qualified.

(17) This Court does not need to judge the correctness of Ryder's assessment of the qualifications of its applicants and decision not to hire Smith; it need only determine that Ryder believed in good faith that there were other applicants more qualified than Smith and that the asserted reason for the decision was not a mere pretext for discrimination. *Moore v. Sears Roebuck & Co., supra; Jones v. Los Angeles Community College District, supra; Bostic v. Wall,* 588 F.Supp. 994 (W.D.N.C.1984), *aff'd,* 762 F.2d 997 (4th Cir.1985). The Court concludes that the EEOC failed to show by a preponderance of the evidence that Ryder's reasons for not hiring Smith were a pretext for sex discrimination. The only evidence that could be used to show discriminatory motive on the part of Ryder is Britt's statements to Smith made during her road tests that he was concerned about her physical size and the risk of injury in using the Jifflox and that he would not want his wife going into the satellite termi-

nals alone during odd hours. These statements alone, however, are not sufficient to support the allegation of sexual discrimination, and the EEOC has not otherwise produced a preponderance of evidence to rebut Ryder's asserted reasons.

(18) Consequently, the Court concludes that the EEOC should not prevail on any of its claims for the above-stated reasons.

(19) Any finding of fact which is determined also to be a conclusion of law is so deemed, and any conclusion of law which is determined also to be a finding of fact is so deemed.

(20) A Judgment dismissing the EEOC's action with prejudice will be filed simultaneously with this Memorandum of Decision.