571 F.2d 1330
 20 Fair Empl.Prac.Cas. 1314, 16 Empl. Prac.
Dec. P 8274
John GARNER, Plaintiff-Appellee,
v.
Clarence B. GIARRUSSO, Individually and as Superintendent of
New Orleans Police Department, et al., Defendants,
City of New Orleans, Defendant-Appellant.
 No. 75-2771.
 United States Court of Appeals,
Fifth Circuit.
 April 26, 1978.
 
 Michael A. Starks, Joel P. Loeffelholz, Asst. City Attys., Philip S. Brooks, City Atty., New Orleans, for defendant-appellant.
 John B. Garner, pro se.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before TUTTLE, CLARK and RONEY, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 This is a case in which Garner, a former member of the New Orleans Police Department, alleges racial discrimination in the course of his employment and in his discharge from the force. More specifically, Garner contends that racial discrimination in the police department infected the transfer and assignment practices, deprived him of an opportunity to take an examination for promotion, caused him to undergo psychological re-evaluation, and resulted in his ultimate discharge in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission (E.E.O.C.). He brought this suit against the city of New Orleans, the superintendent of police, the mayor, the New Orleans Civil Service Commission, and the Commission members under Title VII of the Civil Rights Act of 1964, as amended in 1972, 42 U.S.C. § 2000e, and under 42 U.S.C. §§ 1981 and 1983 to seek reinstatement and back pay as well as declaratory, injunctive, and other relief. After pretrial dismissals and summary judgment as to some defendants, the case proceeded to trial in the United States District Court for the Eastern District of Louisiana against only the city of New Orleans.
 
 
 2
 The District Court, sitting without a jury, found that Garner had been discriminated against in his transfer and re-evaluation but that his discharge was the result of Garner's refusal to obey orders and was not racially premised. To compensate Garner for the mental anguish and humiliation he endured during the course of his employment, the court, relying principally on § 1981, awarded Garner $5,000. The city filed its appeal to challenge the propriety of an award of monetary damages against a municipality and to seek reversal of the district court's findings of racial discrimination. The city further contends that res judicata or collateral estoppel should have barred the suit initially because Garner sought and received a full hearing before the Civil Service Commission and that body determined that he had been discharged for cause and not because of racial discrimination. Garner has filed a cross-appeal to seek a reversal of the district court on the discharge, reinstatement, and back pay issues.
 
 I. STATEMENT OF FACTS
 
 3
 When Garner joined the police force in 1965, he served in an all-black unit known as the Project Detail.[1] In 1968 he was transferred to the K-9 Corps, where he was the only black among 13 to 16 men. In September 1972 he was transferred, over his strenuous objections, to the Fourth District. He was suspended and ultimately discharged in May 1973 after failing to respond to an assigned call. Testimony at trial described incidents which occurred during each of these assignments, but the bulk of the evidence focused upon alleged discrimination during Garner's service in the K-9 Corps and in the Fourth District.
 
 
 4
 The district court found that Garner encountered discrimination from the very moment he joined the K-9 Corps. As a trainee, Garner was required to spend a disproportionate amount of time in supervising car washing, an unpopular task among the new officers. During his job training program, Garner was virtually ignored if his white classmate failed to show up. Garner also failed to receive the customary two-week on-the-job training with an experienced officer. In fact, all of the experienced men "pulled up sick" when he first reported for duty. The plaintiff attempted to show that he was discriminated against in later assignments which he received in the K-9 Corps, but the district court found that Garner received no more than his share of unpopular assignments after training. However, while other officers worked in teams, Garner was always alone. Indeed, the district court described Garner as somewhat of a loner. He did not socialize or joke with his co-workers, but remained aloof. His work, though, was satisfactory.
 
 
 5
 During the course of his service in the K-9 Corps, Garner complained occasionally about police department policies which he felt reflected racial prejudice. One of his main complaints was that the police failed to respond to calls in his neighborhood, which was in the vicinity of the Fisher Housing Project, a high-crime area. Consequently Garner was forced to come to the aid of his neighbors during his off-duty hours. This antagonized some of his neighbors, who were less than fond of police officers. As a result of what Garner viewed as police indifference, he felt that he and his family were placed in danger. Garner claimed that he had been shot at near his home, although some testimony contradicted this assertion. Garner voiced his complaint to the superintendent of police and others, but apparently the situation did not improve, at least in Garner's opinion.
 
 
 6
 As a member of the K-9 Corps, Garner was entitled to transport his dog to and from work in a patrol car and to keep the car during his off-duty hours. However, Garner felt that the car drew attention to the fact that he was a policeman and placed his family in greater jeopardy. He chose instead to use his personal car. The other men in his unit used the patrol cars and also collected an additional $30 per month by submitting a voucher which stated that they used their personal cars to transport their dogs to and from work. Garner refused to follow this practice because he felt that it was dishonest. His co-workers resented his punctiliousness either as an insult to their integrity or as a threat to their $30. Shortly before his transfer, someone put sugar in the gas tank of his personal car while it was parked in the police garage. Naturally Garner assumed that the prank was the work of his fellow K-9 officers. He reported the incident but requested that no disciplinary action be taken.
 
 
 7
 The situation climaxed in the transfer of Garner out of the unit. His superior officer testified that the transfer was necessary because Garner caused dissension in the K-9 unit. However, the district court found that the transfer was based not on any poor performance by Garner but on the attitude of the other men. Because it believed that Garner's character traits would have been accommodated had he been white, the court held that the transfer was in fact racially discriminatory. If Garner's refusal to sign the voucher was the source of the dissension, the district court stated, the wording of the voucher should have been changed so as to acknowledge that the stipend could be collected even when officers used a patrol car. Instead the supervisors permitted Garner's co-workers to dictate transfer policy rather than insisting that racial differences be tolerated.
 
 
 8
 In an effort to prevent his transfer, Garner met with Police Superintendent Giarrusso, who asked him to "search his soul" for evidence of joint responsibility for the dissension. Giarrusso had known Garner earlier and had always found him uncommunicative. At this meeting Giarrusso offered to let Garner select his next assignment, but Garner insisted that he should be permitted to stay in the K-9 Corps. Instead he was assigned to the Fourth District, an area which encompassed both his home and the Fisher Project. Fearing that he and his family would be in even greater danger now, Garner asked for an immediate transfer. He complained to the Civil Service Commission, the mayor, the city Human Relations Commission, and finally filed a charge with the E.E.O.C. Garner attempted to prove at trial that his assignment breached a department policy against assigning an officer to his own neighborhood. However, the city showed that many members of the Fourth District were area residents and that they were often selected on that basis to assure continuity of police service if the bridges which connected that area to the rest of the city were ever washed out. The district court held that the assignment was nondiscriminatory.
 
 
 9
 Shortly after his assignment to the Fourth District, Garner was ordered to undergo psychological re-evaluation. Superintendent Giarrusso took full responsibility for the order and based his decision to do so on what he viewed as personality changes in Garner and on a letter of complaint written by Garner. The district court held that the asserted reasons for the re-evaluation did not warrant that action and that the decision was discriminatory. Garner's personality, by Giarrusso's own testimony, had remained very much the same. Garner was required to take 18 days of sick leave while the psychological testing was accomplished. He was scheduled to take an examination for promotion during this time but was unable to obtain official permission to leave home for the exam. Consequently, he missed the exam and claims that the re-evaluation was ordered for that precise purpose. The district court made no express fact finding on this point, but did say that Garner appeared to be the victim of administrative inefficiency or the classic runaround.
 
 
 10
 Garner's brief service in the Fourth District was not a pleasant time for him. His fears about his safety increased and perhaps became almost overwhelming. He felt that his superiors were discriminating against him and that his fellow officers harassed him. His earlier complaints about the Fourth District's failure to respond to calls in his area were well known by his co-workers. Again he was required to patrol alone rather than with a partner.
 
 
 11
 Toward the end of a twelve-hour shift on March 5, 1973, Garner was assigned to investigate a theft complaint in the Fisher Project. He acknowledged the radio dispatch and then telephoned headquarters to request reassignment of the call. Garner told the communications officer about the dangers he faced in that area. He was told to speak to his superior who was at the scene of the theft, but he went instead to the station and spoke to another officer. On the basis of the transcript of the taped conversation with the dispatcher, the district court found that Garner had disobeyed a direct order and had been discharged for that reason. The district court found no evidence to support Garner's position that requests for reassignment were made frequently when officers did not want to accept an assigned risk. The court also found that Garner would have received the same punishment even if he had been white and that Garner's race did not affect the decision to discharge him. However, the district court did not deal with Garner's allegation that the discharge was in fact retaliation for filing an earlier charge with the E.E.O.C.
 
 
 12
 Garner appealed his discharge to the Civil Service Commission and was given a post-termination hearing. The Commission found that the discharge was proper and was not the result of racial discrimination. While the Commission action was pending, Garner filed this suit.
 
 II. SUFFICIENCY OF THE EVIDENCE
 
 13
 Both parties argue on appeal that the findings of fact and conclusions of law unfavorable to them are in error and should be reversed. However, our careful review of the record has convinced us that the challenged fact findings are not clearly erroneous as required by Fed.R.Civ.P. 52(a) for reversal. Furthermore, the district court was correct in concluding that Garner's transfer and re-evaluation were the results of discrimination but that his discharge was not. Causey v. Ford Motor Co., 516 F.2d 416 (5th Cir. 1975); Bolton v. Murray Envelope Corp., 493 F.2d 191 (5th Cir. 1974).
 
 
 14
 As for Garner's claim that his re-evaluation was scheduled in order to cause him to miss the promotional examination offered during his sick-leave, the district court made no express finding on this point. But in stating that Garner missed the exam because of department inefficiency or a runaround, the court implied that there was no invidious plot to prevent Garner's availability for the exam. Nor does the record establish Garner's claim. Consequently, we find no error justifying a reversal or remand. To the extent that the court found discrimination in the re-evaluation order, compensatory damages were awarded.
 
 
 15
 Garner also alleged that his discharge was in retaliation for filing a charge of discrimination with the E.E.O.C. The district court's opinion is silent on this point. Again, however, the record is inadequate to support a finding in Garner's favor on this claim. Other than establishing that Garner had in fact filed a charge and that police officials knew this, the allegation was simply ignored at trial. The district court was not required to make an explicit finding on an issue which had not been adequately developed by the plaintiff.
 
 
 16
 Garner urges us to reverse the district court's judgment as to his discharge, but we are unable to do so. The evidence adduced at trial justified a finding that Garner had disobeyed orders and had been discharged for that reason. Although the district court did not cite McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) in its opinion, it is clear that the court applied the correct legal analysis required by that decision. In finding that Garner would have received the same punishment if he had been white, the court was clearly considering whether Garner's violation of police regulations was a mere pretext for his discharge. Hence, this case is distinguishable from Corley v. Jackson Police Department, 566 F.2d 994 (5th Cir. 1978), where the district court demonstrated from its comments during trial that it had failed to follow the three-part analysis set forth in McDonnell Douglas. No such comments appear in the record before us. If the district court in the instant case had had the benefit of our Corley decision at the time of Garner's trial, it would perhaps have chosen to treat the pretext point in more detail. However, we find no error in the court's treatment of the issue.
 
 III. RES JUDICATA
 
 17
 The second issue for our consideration is whether principles of res judicata or collateral estoppel should have been held to bar Garner's Title VII and § 1981 claims of employment discrimination because he received a hearing before the New Orleans Civil Service Commission. The defendant argues that res judicata should have been applied because "this suit is between the same parties on the same cause of action and it has the same object." Brief for Appellant at 4.
 
 
 18
 The Supreme Court explained the effect of res judicata and collateral estoppel in Southern Pacific Railroad Co. v. United States, 168 U.S. 1, 48-49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897):
 
 
 19
 (A) right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified.
 
 
 20
 Application of res judicata requires an identity of causes of action. If that test is met, the former judgment may be conclusive as to all issues which were or might have been litigated. Frazier v. East Baton Rouge Parish School, 363 F.2d 861 (5th Cir. 1966). If the second action involves a different cause of action, the prior judgment may be held conclusive as to those matters which were actually put in issue, litigated, and necessarily decided in the first action. Tipler v. E. I. duPont deNemours & Co., 443 F.2d 125, 128 (6th Cir. 1971).
 
 
 21
 Res judicata is typically applied only when there has been a prior judicial proceeding. However, the Supreme Court has stated that
 
 
 22
 (w)hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.
 
 
 23
 United States v. Utah Construction Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). This court adopted that approach in Painters District Council No. 38 v. Edgewood Contracting Co., 416 F.2d 1081 (5th Cir. 1969). We held there that a prior determination of the National Labor Relations Board on a liability issue was res judicata in a subsequent damage suit between the same parties where the Board had conducted a full hearing, the parties had been represented by counsel, and both sides had had a full opportunity to present evidence and to cross examine witnesses. We recognized that Board proceedings and damage actions were separate remedies which could be utilized simultaneously; nevertheless, we held that res judicata was appropriate when one action had preceded the other. However, we cautioned that res judicata may apply to some administrative proceedings but not others and that each situation calls for careful examination. Res judicata was particularly appropriate in the Painters case because of the NLRB's expertise in the area of labor disputes of the kind involved there.
 
 
 24
 Even when the prior decision is made in a judicial, rather than an administrative, forum neither res judicata nor collateral estoppel is rigidly applied. Both defenses must be qualified or rejected when their use would contravene an overriding public policy or result in manifest injustice. Tipler v. E. I. duPont deNemours Co., supra.
 
 
 25
 We hold that the district court was correct in granting Garner a de novo trial on all of his allegations of racial discrimination for two reasons. First, the scope of the administrative hearing was much narrower than that of Garner's lawsuit. Second, although the procedural safeguards afforded in the Civil Service Commission hearing were satisfactory for its purpose, that body was not a competent forum for the resolution of federal claims of employment discrimination brought under Title VII and § 1981.
 
 
 26
 Whereas in Painters, the precise liability issues presented to the court had been raised previously before the NLRB, here Garner's complaint touched upon matters totally unrelated to his discharge and beyond the jurisdiction of the Civil Service Commission to consider. The Commission's function was to assure that Garner had in fact breached police department regulations and had been dismissed for that reason and not because of racial discrimination. The Commission was not asked to remedy any discriminatory practices which might have occurred during Garner's tenure as a police officer. Had the district court applied res judicata so as to bar Garner's subsequent lawsuit, manifest injustice would have occurred because Garner would have been deprived of an opportunity to challenge the department's transfer, assignment, and re-evaluation practices.
 
 
 27
 Application of res judicata would also have contravened an important public policy favoring private litigation as a means of eradicating employment discrimination. In Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court recognized the strong congressional policy against depriving a Title VII litigant of his right to adjudicate his claim in the federal courts even when his claim has been previously submitted to final arbitration. The Court stressed that the federal courts possess "ultimate authority" for securing compliance with Title VII and that private litigants play a vital role in vindicating "the important congressional policy against discriminatory employment practices." Id. at 45, 94 S.Ct. at 1018. The Court noted that Congress has provided overlapping remedies against discrimination, including Title VII, § 1981, and § 1983. Even the structure of Title VII anticipates the use of several forums because it requires deferral to certain state and local agencies, 42 U.S.C. § 2000e-5(c), and filing a charge with the E.E.O.C., 42 U.S.C. § 2000e-5(b),[2] before a suit may be initiated in federal court. The Alexander Court specifically commented that none of these administrative actions have been held to foreclose a later action in federal court. 415 U.S. at 47-48 and n.8, 94 S.Ct. 1011. Rather,
 
 
 28
 the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.
 
 
 29
 Id. at 48-49, 94 S.Ct. at 1019-1020 (footnote omitted).
 
 
 30
 While Alexander v. Gardner-Denver Co. does not directly control the res judicata issue in this case, we do find its underlying rationale helpful. Certainly that decision presents strong policy reasons to support our holding. It also supports our view that Garner's claim before the Civil Service Commission differed in essential ways from his suit in district court. In appealing his discharge to the Commission, Garner was exercising a right granted to him under the terms of his employment contract with the city of New Orleans. The Supreme Court dealt with a similar situation in Alexander v. Gardner-Denver Co., where it stated:
 
 
 31
 In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.
 
 
 32
 Id. at 49-50, 94 S.Ct. at 1020. Accordingly, the Supreme Court rejected res judicata, collateral estoppel, election of remedies, waiver, and deferral as defenses to the plaintiff's Title VII claim.
 
 
 33
 The decisions of this court are in agreement with the position of the Supreme Court. We have held that an employee could proceed with a § 1981 suit to challenge employment discrimination even though the plaintiff's claim was also pending before the NLRB. Guerra v. Manchester Terminal Corp., 498 F.2d 641 (5th Cir. 1974). We noted there that the various remedies for employment discrimination may overlap, but they are nevertheless separate and independent statutes under which relief might be sought. See also Taylor v. Armco Steel Corp., 429 F.2d 498 (5th Cir. 1970) (prior court decision on the basis of the National Labor Relations Act no bar to later Title VII suit).
 
 
 34
 Our holding here is certainly in accord with decisions in similar situations in other circuits. See, e. g., Cooper v. Philip Morris, Inc., 464 F.2d 9 (6th Cir. 1972); Batiste v. Furnco Construction Corp., 503 F.2d 447 (7th Cir. 1974); Voutsis v. Union Carbide Corp., 452 F.2d 889 (2d Cir. 1971). Nor is the decision of the Court of Appeals for the Second Circuit in Mitchell v. National Broadcasting Co., 553 F.2d 265 (2d Cir. 1977), contrary to our holding because a key element in the application of res judicata to the employee's § 1981 claim in Mitchell was the fact that the plaintiff had sought review of the agency decision in the state courts.
 
 
 35
 Utilization of state courts for review of agency action was also the basis for our decisions in a number of cases involving the discharge of public school teachers. See, e. g., Cornwell v. Ferguson, 545 F.2d 1022 (5th Cir. 1977); Jennings v. Caddo Parish School Board, 531 F.2d 1331 (5th Cir. 1976); Frazier v. East Baton Rouge Parish School, supra. In contrast to the plaintiffs in these teacher discharge cases, Garner did not seek review of the Commission's decision in the state courts, and we express no opinion as to the consequences if he had done so.
 
 
 36
 As for the question of whether collateral estoppel should have been applied to prevent the relitigation of the facts surrounding Garner's discharge, we hold that the court was not in error in providing a de novo hearing on those issues. Since the city was successful in both forums anyway, we fail to see what it hopes to accomplish by its argument. In any case, Alexander v. Gardner-Denver Co. strongly supports de novo treatment of all issues in a Title VII claim. The Alexander Court left to the discretion of the district court the determination of how much weight should be accorded to the prior decision of the arbitrators. The district court in the instant case certainly acted within the proper scope of its discretion when it decided to accept evidence on the discharge issue. This is particularly true because the outcome of the discharge issues determined whether Garner would be entitled to reinstatement and back pay.
 
 IV. MUNICIPAL IMMUNITY
 
 37
 The final issue raised by the city is whether a municipality may be held liable under § 1981 for monetary damages which compensate for mental anguish and humiliation. In support of its argument in favor of immunity, the city cites City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); and Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), all of which dealt with an absence of municipal liability under 42 U.S.C. § 1983.
 
 
 38
 We note first of all that § 1981 is clearly available as a statutory remedy against racially based employment discrimination in both the private and public sectors. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); Mizell v. North Broward Hospital District, 427 F.2d 468 (5th Cir. 1970). It is also well settled that compensatory damages are an appropriate remedy in at least some § 1981 suits, Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), including suits for racial discrimination in private employment, Johnson v. Railway Express Agency, Inc., supra. This court has also held that a municipality may be held liable under § 1981 for an award of back pay, an equitable remedy, and that the Eleventh Amendment does not bar an action against a municipal corporation which is locally controlled, essentially local in nature, and separately funded so as to prevent a depletion of state funds. Campbell v. Gadsden County District School Board, 534 F.2d 650 (5th Cir. 1976). Municipalities have been held liable for monetary damages in other contexts unrelated to discrimination, Workman v. City of New York,179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314 (1900) (admiralty). But neither this court nor the Supreme Court has yet decided whether any form of immunity other than the Eleventh Amendment shields a municipality from an award of compensatory damages for suffering and humiliation in a § 1981 action. While other courts which have considered the question have reached differing results,[3] the better reasoned decisions have recognized the essential differences between § 1981 and § 1983 and have permitted damage actions against municipalities under § 1981.[4] Mahone v. Waddle, 564 F.2d 1018 (3d Cir. 1977); United States v. City of Chicago, 549 F.2d 415 (7th Cir. 1977); Sethy v. Alameda County Water District, 545 F.2d 1157 (9th Cir. 1976) (en banc); Maybanks v. Ingraham, 378 F.Supp. 913 (D.Pa.1974). Damage actions against municipalities have also been permitted under 42 U.S.C. § 1982, Morales v. Haines, 486 F.2d 880 (7th Cir. 1973), and under the Fourteenth Amendment, Hostrop v. Board of Junior College District, 523 F.2d 569 (7th Cir. 1975).
 
 
 39
 The district court in this case relied upon § 1981 in awarding $5,000 in compensatory damages to Garner for his suffering and humiliation because Title VII has generally been held not to encompass such compensatory damages within its permissible remedies.[5] The city of New Orleans seeks to persuade us that, while compensatory damages are permissible against other defendants under § 1981, the Supreme Court's § 1983 trilogy somehow requires that municipalities be shielded from such liability under § 1981. We reject the city's argument as wholly without support in either the Supreme Court's § 1983 cases, the wording of § 1981, or its legislative history. Accordingly we affirm the district court's award of damages.
 
 
 40
 In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court held that a municipality was not a "person" for purposes of § 1983 liability.[6] That decision was the result of a thorough examination of the legislative history of § 1983, which was enacted as § 1 of the Klu Klux Klan Act of April 20, 1871, 17 Stat. 13. The Congress which enacted § 1983 had expressly considered and rejected the Sherman Amendment, a provision which would have imposed liability upon municipalities for private acts of violence incurred by residents in violation of their civil rights. The rejection of the Sherman Amendment led the Supreme Court to conclude that:
 
 
 41
 The response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by the Act of April 20, 1871, was so antagonistic that we cannot believe that the word "person" was used in this particular Act to include them.
 
 
 42
 365 U.S. at 191, 81 S.Ct. at 486 (footnote omitted). The Court did not decide whether Congress possessed the power to make municipalities liable for acts of its officials which violated another's civil rights. In Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), the Court adhered to its interpretation of "person" in § 1983, even though the plaintiff argued that a county in his state could be held vicariously liable for the acts of its officials. The nonliability of municipalities did not depend upon state law because Congress had intended to exclude all municipalities from the word "person" in § 1983. Then, in City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), the Court extended the holding in Monroe and Moor to an equity action. The Court stated:
 
 
 43
 We find nothing in the legislative history discussed in Monroe, or in the language actually used by Congress, to suggest that the generic word "person" in § 1983 was intended to have a bifurcated application to municipal corporations depending on the nature of the relief sought against them. Since, as the Court held in Monroe, "Congress did not undertake to bring municipal corporations within the ambit of" § 1983, . . . they are outside of its ambit for purposes of equitable relief as well as for damages.
 
 
 44
 412 U.S. at 513, 93 S.Ct. at 2226. In remanding for a determination of whether the amount in controversy was satisfied for purposes of § 1331 jurisdiction, the Court left room for an inference that a municipal corporation could be held liable, but just not under § 1983. That same implication is present in Moor, which was a suit for damages, because the Court held that a county was a citizen of its state for purposes of diversity jurisdiction under § 1332. It is clear, then, that these § 1983 cases do not support the existence of sovereign immunity for the City of New Orleans.
 
 
 45
 An examination of the legislative history surrounding § 1981,[7] enacted as § 1 of the Civil Rights Act of 1866, 14 Stat. 27, reveals nothing comparable to the rejection of the Sherman Amendment to the 1871 Act and nothing else to support an exclusion of municipalities from the reach of the statute. Nor does the language of § 1981 lend itself to that interpretation.[8] Whereas § 1983 speaks in terms of "persons" who are subject to liability, § 1981 uses the word "persons" to describe those who are benefited by the enactment. See Sethy v. Alameda County Water District, 545 F.2d 1157 (9th Cir. 1976) (en banc).
 
 
 46
 That the legislature would intend to subject municipalities to liability in damages under § 1981, but not under § 1983, is most reasonable. The scope of § 1981 is much narrower than that of § 1983. It protects only against discrimination on the basis of race or alienage, Guerra v. Manchester Terminal Corp., 498 F.2d 641 (5th Cir. 1974), and it deals only with the protection of a limited range of civil rights, including the right to make and enforce contracts. We made this distinction between § 1983 and § 1981 in Campbell v. Gadsden County District School Board, 534 F.2d 650, 654 n.8 (5th Cir. 1974), where we stated:
 
 
 47
 Section 1981 thus allows relief for a limited range of particularly serious civil rights violations in which racial animus is implicated. In view of the fact that section 1981 has more restricted applicability than section 1983, the differences in statutory language that limit liability under section 1983 to "persons" but fail to similarly confine section 1981 liability . . . do not seem unreasonable.
 
 
 48
 We recognize that the Supreme Court has accorded some government officials either an absolute or qualified immunity from damage liability under § 1983. Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutors); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (school officials); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (judges). A decision of this court suggests that a similar immunity might exist for some public officials sued for damages under § 1981. Faraca v. Clements, 506 F.2d 956 (5th Cir.) cert. denied, 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975). In extending an immunity to officials under § 1983, the Supreme Court offered two mutually dependent rationales:
 
 
 49
 (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.
 
 
 50
 Scheuer v. Rhodes, 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974). We do not believe that either of these reasons justifies a limitation upon a municipality's liability in damages under § 1981. The overriding policy against racial discrimination in employment makes it essential to require a municipality to respond in damages for its civil rights violations in the same manner as a private employee. By extending Title VII to state and local governments in 1972, Congress made it clear that employees in the public work force are to be protected against employment discrimination to the same extent as employees in the private sector. See Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). If Title VII did not provide a suitable remedy for Garner, the district court was clearly correct in utilizing a permissible remedy under § 1981 to compensate Garner for the shame and humiliation he endured while serving in the New Orleans police department. We agree with the Court of Appeals for the Seventh Circuit that "it would be anomalous to hold that section 1981 proscribes racial discrimination by purely private actors but not by municipalities." United States v. City of Chicago, 549 F.2d 415, 425 (7th Cir. 1977).
 
 
 51
 Our holding does not pose the problem of imposing vicarious liability upon a municipality because of the acts of its servants. See Hamilton v. Chaffin, 506 F.2d 904 (5th Cir. 1975). Garner's employment contract was with the city, and the city itself was responsible for assuring an absence of employment discrimination. To the extent that it failed to live up to this responsibility, it is liable in damages.
 
 
 52
 As we mentioned earlier, this court has already held that the equitable remedy of back pay may be imposed upon a municipality. Campbell v. Gadsden County District School Board, supra. Just as the Supreme Court in City of Kenosha v. Bruno, supra, saw no reason to adopt a bifurcated interpretation of § 1983 depending on the type of relief sought, we see no logic in limiting a plaintiff to equitable relief under § 1981.
 
 
 53
 The judgment is AFFIRMED.
 
 
 
 [1]
 Garner does not challenge any discrimination which may have existed during his initial assignment. The district court properly considered the evidence of pre-Title VII discrimination only to the extent that it may have shown that some of Garner's fellow police employees were not fully disposed to accepting black officers
 
 
 [2]
 In determining whether there is reasonable cause to believe that a complainant's charge is true, the E.E.O.C. is not bound by any prior determination of a state or local deferral agency. The Commission is required only to "accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of (42 U.S.C. §§ 2000e-5(c) and (d))." 42 U.S.C. § 2000e-5(b). While the instant case does not involve a question of deferral to a local agency of the kind described in § 2000e-5(c), the statutory language just quoted suggests to us that the Civil Service Commission's decision should not be controlling in this situation either. Moreover, the Supreme Court has held that federal employees who seek administrative relief from the Civil Service Commission pursuant to 42 U.S.C. § 2000e-16 are entitled to a trial de novo of their employment discrimination claims despite the existence of an adverse administrative decision. Chandler v. Roudebush, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976)
 
 
 [3]
 See Black Brothers Combined v. City of Richmond, 386 F.Supp. 147 (E.D.Va.1974); Bennett v. Gravelle, 323 F.Supp. 203 (D.Md.1971), aff'd, 451 F.2d 1011 (4th Cir. 1971), cert. denied, 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972)
 
 
 [4]
 See Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922 (1976)
 
 
 [5]
 The district court cited Howard v. Lockheed Georgia Co., 372 F.Supp. 854 (N.D.Ga.1974); Loo v. Gerage, 374 F.Supp. 1338 (D.Hawaii 1974). For a discussion of this point and citations of additional cases, see B. Schei & P. Grossman, Employment Discrimination Law 1258-59 (1976)
 
 
 [6]
 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [7]
 See Virginia Comm'n on Constitutional Gov't, The Reconstruction Amendment Debates (1967)
 
 
 [8]
 42 U.S.C. § 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.