**Erica Benson SPLUNGE, Sandra Calhoun, Tesha Scott and Jo Catherine Smoot, Plaintiffs,**

v.

**SHONEY'S, INC., Defendant.**

**Civ. A. No. 93–D–690–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

Dec. 22, 1994.

Rachel Jackson Moore, Birmingham, AL, E. Paul Jones, Alexander City, AL, Marvin L. Stewart, Birmingham, AL, for plaintiffs.

Forrest Keith Covington, Jay Daniel St. Clair, Birmingham, AL, for defendant.

### MEMORANDUM OPINION

DE MENT, District Judge.

This matter is before the court on defendant Shoney's, Inc.'s motion filed May 4, 1994, for partial summary judgment, which the court construes as a motion for summary judgment.[1] Defendant contemporaneously filed a brief and tendered evidence in support of its motion. Plaintiffs—Erica Benson Splunge, Jo Catherine Smoot, Sandra Calhoun and Tesha Scott—responded in opposition on June 3, 1994. Defendant filed a reply brief on June 20, 1994. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court issues the following opinion.

### SUMMARY JUDGMENT STANDARD

▮ On a motion for summary judgment, the court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). As a result, the court's findings of fact on summary judgment may not, in actuality, constitute the facts disclosed at trial; however, they are the "facts" for present purposes and are set out below. *Rodgers v. Horsley,* 39 F.3d 308 (11th Cir.1994).

Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has stated:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

---

1. Since the filing of defendant's motion for partial summary judgment, plaintiffs have dismissed Counts II, III and IV of the complaint. The only remaining claim (Count I) is now before the court for consideration.

■ In further elaboration on the summary judgment standard, the court has said that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). Summary judgment is improper "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. *See Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

## PROCEDURAL HISTORY

Plaintiffs, who are black females, commenced this action on June 3, 1993. Count I of the complaint alleges sexual harassment under Title VII. Paragraph nine therein alleges that defendant is liable for sexual harassment under the theories of hostile work environment and *quid pro quo.* Counts II and III assert racial discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e–17, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Count IV alleges a violation of the Fair Labor Standards Act for failure of defendant to pay plaintiffs for overtime. Although none of the counts in plaintiffs' complaint specifically assert that defendant's alleged misconduct violates state tort law, the first paragraph of the complaint states that this is an action for, "among other things," invasion of privacy, intentional infliction of emotional distress, and assault and battery.

■ At the pre-trial conference held on November 8, 1994, plaintiffs dismissed all state law claims against defendant, as well as the Fair Labor Standards Act claim (Count IV). Subsequently, the parties in a joint motion on November 29, 1994, dismissed the racial discrimination claims (Counts II and III), plaintiffs conceding that these claims predicated on Title VII and 42 U.S.C. § 1981 are barred by entry of a consent decree in the case of *Haynes v. Shoney's, Inc.,* No. 89–30093–RV, 1993 WL 19915 (N.D.Fla.1993).[2] The case proceeds as to plaintiffs' Title VII claim, which asserts sexual harassment under the theories of *quid pro quo* and hostile work environment. Order on Pretrial Hr'g at ¶ 4(c).[3]

## JURISDICTION

Based upon 28 U.S.C. § 1331 and 42 U.S.C. § 2000e–5(f)(3), the court properly exercises subject matter jurisdiction over this action. The parties do not contest personal jurisdiction or venue.

## FACTS

For organizational purposes, the court will make findings of fact as to each plaintiff and then make conclusions of law as to the Title VII claims based upon the sexual harassment theories of *quid pro quo* and hostile work environment. Finally, the court will discuss the availability of remedies under Title VII. First, however, the court makes the following general findings of fact applicable to all plaintiffs.

Defendant Shoney's, Inc. owns and operates several restaurant chains, including Shoney's, Captain D's and Lee's Famous Chicken Recipe. Plaintiffs—Erica Benson Splunge, Sandra Calhoun, Tesha Scott and Jo Catherine Smoot—are black females and former hourly employees at a Captain D's restaurant in Alexander City, Ala.

---

**2.** *Haynes* involved a nationwide class action for racial discrimination against Shoney's, Inc. The Consent Decree entered in *Haynes* releases Shoney's, Inc. "from any and all claims, demands, charges, complaints, rights and causes of action of any kind, known or unknown" for racial discrimination by class members, which includes plaintiffs in the instant action. *Haynes* Consent Decree at 12–13, Def.'s Evid. Submission, Tab 5. The Consent Decree expressly includes racial claims under both Title VII and 42 U.S.C. § 1981.

**3.** The pretrial order controls the subsequent action of the litigation. The parties are bound by the order and may not introduce at trial issues excluded in the pretrial order. *See Jackson v. Seaboard Coast Line Railroad Co.,* 678 F.2d 992, 1015 n. 34 (11th Cir.1982).

At some time during each plaintiff's employment, Freddie Johns ("Johns") was the store manager, who worked under Ron McClellan ("McClellan"), the area manager. Order on Pretrial Hr'g at ¶ 5. McClellan was responsible for four or five Captain D's restaurants. *Id.* McClellan, in turn, reported to Division Director Cort Harwood, who works out of Shoney's Regional Office in Birmingham, Ala. Neal's Aff. at 1. Two of the assistant managers were James Webber and Kenneth Michael Jones. According to testimony by affidavit, Johns, Webber and McClellan had the authority to hire and fire employees. Jones' Aff. at 1.

Shoney's, Inc. operates what is known as a "Fair Treatment Guarantee" and also has a policy forbidding harassment in the workplace. Jones' Aff., Ex. 1 attached thereto. Shoney's, Inc. included this information in a poster to notify employees of their rights. The "Fair Treatment Guarantee" provides a method, which encourages employees to report grievances. The express written policy prohibiting harassment provides in part:

> Shoney's Inc. prohibits harassment of any employee by any other employee based on sex, national origin, race, color, age, religion or handicap. Harassment cannot always be precisely defined, but, for example, sexual harassment includes unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature such as sexually-related comments or physical contact. No management, staff employee, supervisor or any employee had any authority to engage in or subject you to any such harassment.

Jones' Aff., Ex. 1 attached thereto. According to Jones, the company policy was neither posted nor mentioned to employees. Jones' Aff. at 1.

The testimony contained in the affidavit of Kenneth Michael Jones complements plaintiffs' allegations. Jones worked at Captain D's from October 1991 to June 1992. On the date he quit, he was an assistant manager. His affidavit states in pertinent part:

> During the time I was employed at Captain D's, I witnessed the girls who were employed there being almost constantly sexually harassed. Mr. Johns and Mr. McClellan were always asking the women to go to bed with them or go off with them somewhere. I know that [plaintiff] Erica Benson was asked specifically. Ron McClellan asked her to go check into a motel with him. Mr. Johns brought in "dirty" pictures and pornographic letters of Philippine women and passed this material around to the employees at the restaurant. Mr. McClellan and Mr. Johns were always making offensive sexual comments to the girls, telling dirty jokes, asking for sexual favors and touching them suggestively. I heard James Webber, the assistant manager, say, "You have to give head to get ahead." On a daily basis the girls worked in an environment in which they were subjected to sexually offensive behavior, dirty jokes and comments—they were propositioned. They were afraid to say anything to the management or to object to this treatment because they were so intimidated by these men. The men had them scared of losing their jobs if they objected in any way.

Jones' Aff. at 1–2 (brackets supplied).

### 1. *Erica Splunge*

Plaintiff Erica Splunge ("Splunge") worked in food preparation at Captain D's from September 1991 until January 1992, when she quit to work at Russell Corp. Pl Splunge's Dep. at 17–18, 160. Splunge interviewed with Johns, who gave her an application. *Id.* at 18. She asked him if she should take home the application and read it before signing. He said she did not need to, that the application contained "stuff ... about house rules" and work hours. *Id.* Johns gave her a uniform shirt and cap and instructed her to report to work the next morning. *Id.*

Splunge's sexual harassment claims center around the conduct of McClellan and Johns. As to Johns, she testified that he made "sexual comments" to her. *Id.* at 12. He also "rub[bed] up against" her "once or twice." *Id.* After she told him she did not like him brushing against her, he quit but continued to say "little sexual things" and tell "jokes." *Id.* She further testified that Johns subjected her to sexual harassment by commenting

on her big breasts and once told her to "get rid of those big breasts." *Id.* at 122.

Johns also would stare at her breasts, and she "caught him looking at other [female employees'] behinds." *Id.* at 122. On another occasion, he asked her if she wanted to see some big breasts and then showed her some wallet-sized photographs of a nude girl from the Philippines. *Id.* at 122–23. In one of the pictures, the girl had her "legs spread" and was touching herself sexually. *Id.* at 124.

As to McClellan, Splunge testified that he regularly commented on her large buttocks and breasts. *Id.* at 36. Splunge said she also heard McClellan tell another employee that she "sure [had] a round behind ... to be so short." *Id.* As to specific comments by McClellan, Splunge testified:

A. Like once he said—how do you want to say it? Talking about my behind.

Q. What were his words?

A. Okay. He was like, you know, you have a big behind. Do all black women have big behinds? Things like that.

\* \* \* \* \* \*

Q. Okay. The big behind comment, did he only say that to you one time?

A. No he didn't.

Q. How many times.

A. Plenty. I couldn't name, but it was plenty and about my breasts.

Q. What did he say about your breasts?

A. How big and soft they was [sic]. Because once he come [sic] by me, I was making salads and he rubbed up against me. I asked him what was he doing, and he told me, oh, he knows I liked it. And I said, no, I didn't. And Mr. Johns was at the table and Mr. Johns kind of looked and smirked when he did it. [McClellan] said, [go] tell ... Mr. Johns, and he went back over there laughing and I went to the front.

*Id.* at 28, 35. On another occasion, McClellan commented on her uniform shirt stating, "[Y]ou sure do need a bigger size." *Id.* at 35.

The next episode of sexual harassment is the "freezer" incident. Splunge testified that one day she went back to the walk-in freezer, and McClellan followed her and was "just talking." *Id.* at 29. Splunge was doing something in the freezer, and he told her that she "couldn't get out of the freezer unless [she] kissed him." To use her words, Splunge then told him that both of them would "freeze in this mother f_____." *Id.* Without responding, McClellan left the freezer. *Id.*

Other comments by McClellan revolved around his sexual affair with another employee named Cheryl Key. *Id.* at 39. Splunge testified that McClellan told her this or this in substance: "How do you think Cheryl Key got the position she's in." *Id.* at 29, 39. Splunge further testified that although he never named other female employees, McClellan would talk about how he "gave them money and how they didn't have to worry about things." *Id.* at 37.

On another day, Splunge came to work an hour early and McClellan also was at the restaurant. She started to "prep" the food, and "he started coming onto" her. *Id.* at 99. McClellan told her that the prep table was clean and they could do anything she wanted to do because the other employees would not report to work for another hour. *Id.* She told him that she did not want to do "anything" with him. McClellan then followed her into the freezer and back out again and rubbed her buttocks with his hand. *Id.* She told him, "[D]on't touch me." *Id.*

The sexual saga continues with the "motel" scenario. One time McClellan was staying overnight in a local motel. Splunge testified that he asked her and another employee to come to the hotel and have drinks with him, "shoot the bull, drink, do nothing and just have some fun." *Id.* at 66. They refused the solicitation and later he came back and told them his room number. *Id.* When Splunge refused again, he "flipped out his wallet with all these hundred dollar bills laying there in his hand. He took out two and said, '[Y]ou can have this.'" *Id.* at 67. Splunge replied that she "did not do things like that." *Id.* McClellan said, "[W]ell, if you think about it, you know where my room is." *Id.* Splunge said that she went home crying after that. *Id.*

Splunge stated that McClellan generally subjected her to harassment when no one else was around and would say things such as "you smell good today; I like your hair; you've got big breasts; why don't you come closer so you can hear me better." *Id.* at 42. Splunge also said that "every time McClellan [came] to the store," he would "look" at her and other female employees, and she did not like it. *Id.* at 36.

Splunge also stated that McClellan refused Splunge's request to work at the front counter stating that he only wanted "fine sexy things" at the front counter. *Id.* at 257. Splunge also related her attempts to obtain a pay raise. She requested on "many occasions" to take the company's "Star Track Test," which was a condition precedent to receiving a pay raise. *Id.* at 148, 150–52. Neither McClellan, Johns nor Webber would allow her to take the test, their reasoning being "you can take it later; or you don't know enough." *Id.* Splunge said, however, that they allowed another employee to take the test who had less seniority than she, allegedly because this employee was having an affair with Webber, one of the assistant managers. *Id.* Splunge said that even though that employee failed the test, she received a pay raise. *Id.* Splunge asserts that the conduct of McClellan made her job difficult to perform because "she did not grant sex" and that her continual refusal resulted in a lost promotion. Pl.s' Resp. to Def.Mot.Summ.J. at 19.

Splunge stated that while she never complained to higher management about sexual harassment, she and a co-employee complained to one another about how "nasty" Johns acted. Pl. Splunge's Dep. at 22–23. She said that she tried not to let the alleged harassment "bother" her, but she was "offended" and embarrassed. *Id.* at 29.

### 2. *Jo Catherine Smoot*

Jo Catherine Smoot ("Smoot"), who also was hired by Johns, worked as a cook and food preparer during her employment from "October or November" 1991 until March 1992. Pl. Smoot's Dep. at 16, 23–25, 134. Smoot's complaints of sexual harassment pertain to Webber and Johns, not McClellan. *Id.* at 95.

Smoot testified about two alleged sexual incidents involving Johns. First, she said Johns told her on more than one occasion that "[i]f I had you in bed, you wouldn't have to worry about nobody else." *Id.* at 46. Second, she testified that Johns would walk by her while she was working and rub the front of his body against her backside. *Id.* at 51. He would rub against her for a "minute or so," or at least long enough for her to have to tell him to move. *Id.* at 52.

As to Webber, she testified that "[h]e would walk by and rub up against you," or "[t]ake his hand and feel on your behind." *Id.* at 61. She continued by stating: "I remember one day I came in [and] he ... told me I better be glad that he had a girlfriend because I would be in trouble if he didn't." *Id.* She told him that "whether or not he had a girlfriend, [she] wouldn't be in no trouble," and he just "laughed." *Id.* at 62.

Smoot testified that Webber sexually harassed other employees as well. For example, she said that Webber had a "real bad habit" of saying things to new employees such as "I want you, or I am going to get you." Pl.s' Br. in Resp. to Def.'s Mot. Summ.J. at 19, *citing,* Pl. Smoot's Dep.

She further testified that both Johns and Webber directed "a lot of nasty talking" toward her. There also were "times" when they would walk by and either rub their hands on her or rub against her. Pl. Smoot's Dep. at 44–45. Specifically, Smoot said that "sometimes [Johns'] whole body" touched her backside. *Id.* at 49–51. She said both Johns and Webber thought it was funny, but she did not. *Id.* at 44–45.

### 3. *Sandra Calhoun*

Sandra Calhoun ("Calhoun") began working at Captain D's when the restaurant opened in September 1987. Pl. Calhoun's Dep. at 31, 105. She quit after working there almost a year but returned in February 1989. *Id.* at 43. Calhoun remained employed at Captain D's until April 1992. *Id.* at 43–44. During those two periods of employment, Calhoun worked as a food preparer and a counter employee. *Id.* at 79–80.

During Calhoun's deposition, she emphatically stated that she based her claim only on race discrimination, not sexual harassment. *Id.* at 106.[4] During the course of her deposition, however, she testified as to eight incidents, which may be construed as assertions of sexual harassment.

First, she testified that Johns occasionally would comment on her buttocks. Specifically, he would say, "[W]ow looky there ... I wouldn't mind having that." *Id.* at 134. Second, Johns "always showed [her] nasty pictures." *Id.* at 109. According to Calhoun, Johns had photographs in his wallet of a naked girl, who supposedly was his girlfriend; he would show the pictures to her and other employees "for no reason." *Id.* at 114–16, 120–24. Third, Johns once told her that she needed to lose some weight in her buttock area. *Id.* at 132. She admitted, however, that Johns never asked her to "go out with him" or "to have sex with him." *Id.* at 109.

Fourth, as to black women, Webber said this or this in substance: "[T]hey know how to screw, you know, they know how to do their thing.... [T]hey know how to throw their thing." *Id.* at 136. Fifth, Webber would openly discuss in the presence of her and other employees his sexual activities with another employee named Renee. *Id.* at 124–26. Sixth, at work Webber would approach Renee when she was sitting on a table and "pull her to him." At other times, Renee would "lay down on the table," and Webber would "straddle" and kiss her. *Id.*; *see also id.* at 127.

Seventh, McClellan[5] told Calhoun that from his experience, "black women know how to do it" and that he "wouldn't mind having [him] a black woman." *Id.* at 139–140. She stated that McClellan's comments offended her. *Id.* at 139. He also would "bump"

against her with either his shoulders or hips. *Id.* at 110–11.

Calhoun admitted that during her employment she never complained to anyone about the alleged sexual harassment. *Id.* at 67, 70. After she quit her job (because she was scheduled to work on Easter Sunday), she made complaints and was ultimately put in touch with Shoney's, Inc.'s headquarters in Nashville, Tenn. *Id.* at 70–79. However, her only complaint related to her scheduling change, not sexual harassment. *Id.* at 78.

#### 4. *Tesha Scott*

Plaintiff Tesha Scott ("Scott") predicates liability under the sexual harassment theory of hostile work environment, not *quid pro quo*. Pl.s' Br. in Opp. to Def.'s Mot.Summ.J. at 29. Scott, a teenager and student, worked part-time from September 1991 until May 1992. Pl. Scott's Dep. at 25, 69. At first, she worked in the dining room, "cleaning, sweeping and serving the guests." *Id.* at 25. Later her duties increased and included operating the cash register. *Id.* Scott testified that no one ever explained the company policies to her. *Id.* She also said that at some point during her employment, Davis replaced McClellan as the manager of the store.[6] *Id.* at 69, 81–82. Scott quit her job at Captain D's and accepted a position at Russell Corp., because "she was going to make more money." *Id.* at 116.

As to Johns, Scott testified that he would not move out of the aisle at work when she "polite[ly]" asked him to move; thus, when she passed him, she necessarily brushed against him. *Id.* at 50–51. Second, Scott testified that while he was "always looking and staring" at her, the only comment that bothered her was when she heard Johns tell a co-employee that Scott had a "big ... butt" like a "dog." *Id.* at 51, 54–55. In her words, that was the "only problem [she] had" with Johns. *Id.* The co-employee agreed with

---

4. When asked is she was mistreated because she was female, she said:

 A. Well, it wasn't because of my sex. It was because of my color. That is what it was. I were [sic] discriminated against because of my color.
 Q. Okay. So, as we sit here today, you are not claiming that you were treated differently

or discriminated against because you are a woman?
 A. That is true.

5. The court notes that at her deposition, Calhoun incorrectly referred to McClellan as McCollough.

6. The court notes that Davis' first name is not stated in the record.

Johns, saying, "[Y]eah, Mr. Johns, that is a big old butt." *Id.* at 53. Third, Johns once showed her a wallet-sized photograph of a woman tied to a bed. He then told her to tell other unspecified employees that "if they didn't act right, he was going to tie them up to the bed like he did the lady." *Id.* at 57.

Scott testified as to two "problems" she had with McClellan. *Id.* at 84. On one occasion, McClellan told her to tuck her shirt in so her "hips and stuff could show." *Id.* at 61. Although she testified that she "thought" the company policy required all employees to tuck in their shirts, she never did because "everybody was always talking about [her] butt." *Id.* at 63. She did, however, go to the bathroom and privately tucked in her shirt tail. McClellan then told her "that looks much better," as he "looked at [her] up and down." *Id.* at 62. Immediately thereafter McClellan made a comment that if she were older, "he would go with [her], something like that," to which Scott replied, "[Y]ou ought to be ashamed of yourself." *Id.* at 67. He said, "[Y]eah, but I am not." *Id.*

Scott's other complaint occurred the same day when she was replacing a light bulb near the overhead menu. To reach the light, she had to be lifted up to the counter, as there was no stool or ladder available. *Id.* at 84–85. McClellan told Scott he would lift her onto the counter, and she agreed. *Id.* at 93. As McClellan lifted her onto the counter, he moved his fingers back and forth between her waist and breasts in a massage-like fashion. *Id.* at 93, 95. He did not, however, touch or fondle her breasts. *Id.* at 93.

She further testified that on one occasion she met with Davis and didn't complain. *Id.* at 82. She said that although she felt comfortable talking to Davis about the harassment, she did not complain about McClellan, because "they didn't work together." *Id.* at 83.

Moreover, Scott testified that she never saw Johns, McClellan or Webber sexually harass any other female employee. *Id.* at 102–03. Finally, the only person to which she complained about the alleged sexual harassment was Jones, an assistant manager, and the only incident of which she complained involved Johns' refusal to allow her to pass him in the aisle at work. *Id.* at 98. She never made any complaints to Harwood or Davis about either McClellan or Johns. *Id.* at 98. Finally, Scott admitted that no one ever told her that in order to get a promotion, she would have to have sex with management. *Id.* at 135.

## ADMINISTRATIVE REMEDIES

The court finds that plaintiffs have properly invoked the court's jurisdiction by exhausting their administrative remedies. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973) (stating that federal courts have jurisdiction to hear Title VII claims when a plaintiff has (1) filed timely charges of employment discrimination with the Equal Employment Opportunity Commission and (2) receives and acts upon the Commission's statutory notice of the right to sue). First, under Title VII, a plaintiff has 180 days from the date of the alleged unlawful practice to file a charge with the EEOC. *Equal Employment Opportunity Comm'n v. Commercial Office Prods. Co.,* 486 U.S. 107, 110, 108 S.Ct. 1666, 1669, 100 L.Ed.2d 96 (1988) (*citing* § 706(e), 42 U.S.C. § 2000e–5(e)). Defendant, on its motion for summary judgment, has not asserted that plaintiffs failed to timely file charges with the EEOC. Hence, the court finds that each plaintiff timely filed a charge of discrimination charging *quid pro quo* sexual harassment and hostile work environment sexual harassment. *See* Pl.s' Notice of Filing EEOC Charges. Furthermore, the parties have stipulated that after receiving right-to-sue letters from the EEOC, plaintiffs instituted this action in a timely manner. Order on Pretrial Hr'g at ¶ 5.

## DISCUSSION

The court, before discussing the law as it applies to the plaintiffs' allegations, makes the following general conclusions of law:

■ First, McClellan (area supervisor),

Johns (store manager) and Webber [7] (an assistant manager) are "agents" of defendant for Title VII purposes. Title VII imposes liability on an employer for the improper acts of its agents. 42 U.S.C. § 2000e(b). *See also Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1559–60 (11th Cir.1987) (holding that an agent is one who occupies a supervisory position with the authority to alter the terms and conditions of an employee's employment).

■ Second, for purposes of summary judgment, plaintiffs are *not* deemed to have notice of either the Fair Treatment Guarantee or defendant's policy against harassment. Hence, the court need not confront the suggestion by the Supreme Court and the Eleventh Circuit "that an employer may be insulated from liability for hostile working environment [based on] sexual harassment where (1) the employer has an explicit policy against sexual harassment and (2) it has effective grievance procedures 'calculated to encourage victims of harassment to come forward' that the plaintiff did not employ." *Sparks,* 830 F.2d at 1560, *quoting Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 73, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (brackets supplied).

## I. TITLE VII SEXUAL HARASSMENT

■ Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. 2000e–2(a)(1). This section prohibits an employer from sexually harassing its employees. In *Meritor Sav. Bank,* 477 U.S. at 65–66, 106 S.Ct. at 2404–05, the Supreme Court of the United States recognized two distinct types of sexual harassment under Title VII: *quid pro quo* and hostile working environment. Since *Meritor Sav. Bank,* courts have established that the elements of proof vary significantly between the two types. The determination of sexual harassment should be based upon an analysis of all the circumstances.[8] *See Meritor Sav. Bank,* 477 U.S. at 59, 106 S.Ct. at 2402; *see also* EEOC Guidelines, 29 C.F.R. § 1604.11(b) (1988)

### A. *Quid Pro Quo* Sexual Harassment

■ Plaintiffs Splunge, Calhoun and Smoot allege that defendant either explicitly or implicitly conditioned their job benefits on providing sexual favors. The gravamen of a *quid pro quo* sexual harassment claim is that the employer conditions an employment benefit or job status upon the employee's submission to conduct of a sexual nature. *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989) (citing *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2405). To establish a prima facie case of *quid pro quo* harassment against the employer, plaintiff must show: "(1) that [she] belongs to a protected group, (2) that [she] was subjected to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, and (4) that [her] reaction to the harassment complained of affected tangible aspects of [her] compen-

---

7. As to Webber's authority "to hire and fire" employees, *see* Jones' Aff. at 1. This allegation is unrefuted.

8. The court notes that plaintiffs have alleged in the complaint and the pretrial order that they were constructively discharged. It is unclear whether the constructive discharge claims are based upon sexual harassment, racial discrimination or both. The racial discrimination claims, as previously discussed, are barred by the consent decree, leaving only a possibility that plaintiffs have alleged constructive discharge due to intolerable working conditions caused by sexual harassment.

The court acknowledges that sexual harassment may force an employee to quit her job, giving rise to a separate constructive discharge claim in addition to claims of *quid pro quo* and

hostile working environment predicated on sexual harassment. *See Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900 (11th Cir.1988) (holding that plaintiff established a prima facie case of sexual harassment despite the fact that she quit her employment for other reasons). Defendant, however, has not moved the court for summary judgment on the claims of constructive discharge. Accordingly, the court declines to rule on the constructive discharge claims. If plaintiffs pursue these claims at trial, however, the court has serious concerns as to whether plaintiffs can survive a motion for judgment as a matter of law. The court premises its concerns on a review of the deposition testimony in which each plaintiff states that she quit her job for reasons other than sexual harassment.

sation, or terms, condition or privileges of employment." *Sparks,* 830 F.2d at 1564 (*citing Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982). Not all conduct that may be viewed as sexual harassment creates a basis for recovery under the *quid pro quo* notion. As explained by this circuit:

> The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment. 29 C.F.R. § 1604.11(a)(1) & (2) (1987). As in the typical disparate treatment case, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

*Id.* (citations omitted).

 The Eleventh Circuit has held that an employer is strictly liable for *quid pro quo* sexual harassment of an employee by a supervisor based upon the agency doctrine of respondeat superior. *Henson,* 682 F.2d at 909. The rationale behind strict liability in *quid pro quo* actions is readily apparent:

> [T]he supervisor acts upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the quid pro quo. In that case, the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose. He acts within the scope of his actual or apparent authority to "hire, fire, discipline or promote." [citations omitted]. Because the supervisor is acting within at least the apparent scope of his authority entrusted to him by the employer when he makes employment decisions, his conduct can fairly be imputed to the source of his authority.

*Henson,* 682 F.2d at 910. Furthermore, an employer under a *quid pro quo* claim may not escape liability by taking prompt remedial action; "such action by the employer may, of course, mitigate damages." *Id.* at n. 19.

*Analysis*

Defendant's primary contention as to the *quid pro quo* claims is that neither Smoot, Calhoun or Splunge can establish a prima facie case because they have not produced any evidence that their reaction to or refusal to accede to sexual demands caused them to lose a tangible job benefit.[9] The court's analysis begins with the recognition that plaintiffs have satisfied their burdens under elements one and three of the *Henson* analysis. The plaintiffs, as women, belong to a protected group, and the harassment was motivated by gender bias.

### 1. *Erica Splunge*

 Defendant's motion for summary judgment as to Splunge's *quid pro quo* claim is due to be denied because Splunge has satisfied her burden under each element of the prima facie case. Her testimony reveals that she did not welcome the harassment: She emphatically objected to McClellan's ultimatum, i.e., that she had to kiss him before leaving the freezer; she told him not to touch her buttocks; she went home crying after McClellan offered her money to go to his hotel room; and she testified that while she tried not to let her supervisors' behavior bother her, she was embarrassed and offended. This is certainly not the behavior of a woman who invites sexual advances.

The court also finds that the facts produced by Smoot raise a genuine issue of material fact as to the fourth element, i.e., that a plaintiff's refusal to provide sexual favors must affect a tangible job benefit. Splunge testified that pay raises were conditioned upon the taking and passing of the "Star Track Test." While management refused her requests to take the test, another employee with less seniority than Splunge was allowed to take the test. This employee purportedly was having an affair with one of the assistant managers, Webber. The inference which logically may be extracted is that management allowed Splunge's co-employee to take the test because she provided sexual favors to one of the assistant managers. However, management denied Splunge the opportunity to take the test because Splunge

**9.** As stated earlier, Scott does not seek recovery under the theory of quid pro quo.

rejected requests for sexual favors. Such an inference is sufficient to defeat a motion for summary judgment.

### 2. *Smoot*

■ Smoot claims that even though she never specifically requested a promotion or raise, she was implicitly denied such economic benefits, because only those female employees who reciprocated the sexual advances of Johns progressed in their career at Shoney's, Inc. The court finds that Smoot has not established the existence of all of the elements of her claim. The record fails to disclose any suggestion—either implicitly or explicitly—that her employment was conditioned upon granting sexual favors to any of her supervisors.

■ The only particles of testimony even remotely related to a *quid pro quo* claim are at most "merely colorable" and, thus, fall short of disclosing a genuine issue of material fact. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. Although Smoot admits that she never asked for a promotion, she testified that to ask would have been futile because she did not surrender to Johns' harassment. A plaintiff, however, cannot interpose genuine issues of material fact with "a mere inference based on speculation and conjecture." *Lowie v. Raymark Ind.,* 676 F.Supp. 1214, 1216 (S.D.Ga.1987). Smoot also testified that Johns once told her, "If I had you in bed, you wouldn't have to worry about nobody else." The court, even stretching all factual inferences in favor of Smoot, finds that the record is devoid of any evidence as to how this statement implicitly connected the terms of Smoot's employment to providing sexual favors to Johns. *See Sparks v. Regional Medical Center Bd.,* 792 F.Supp. 735 (N.D.Ala. 1992) (finding than an employee did not prove *quid pro quo* sexual harassment when her supervisor's alleged misconduct consisted "only" of sexual comments and jokes directed

at her, offensive language and instances of rough conduct).

### 3. *Calhoun*

■ At the outset, the court notes that Calhoun's deposition testimony is particularly problematic. At her deposition, Calhoun emphatically denies liability based upon sexual harassment, claiming that she only seeks recovery for racial discrimination. During the course of her deposition, however, she testified about eight incidents, which when viewed in a light most favorable to Calhoun, could be construed as assertions of either racial discrimination *or* sexual harassment. While the court recognizes that the conflicting testimony creates an obvious issue as to Smoot's credibility, the court finds that "credibility questions are not appropriate for resolution on motion for summary judgment." *Junkins & Assoc., Inc. v. United States Ind.,* 736 F.2d 656, 659 (11th Cir.1984) (Johnson, J., dissenting).[10] Thus, at this stage of the litigation, the court will presume that Calhoun also states a claim for both types of sexual harassment.

■ Although Calhoun pleaded that she is a victim of *quid pro quo* sexual harassment, her deposition testimony does not support this allegation. Her sexual harassment claims include inappropriate comments about her buttocks, sexual insinuations that black females are better lovers than white females, and a photograph of a naked woman tied to a bed. However indecently her supervisors may have behaved, Calhoun simply has failed to show how the alleged sexual harassment caused a change in her employment status or a denial of a job benefit. In other words, Calhoun's allegations cannot interpose genuine issues of material fact into the litigation, so as to preclude entry of a summary judgment. Accordingly, summary judgment is due to granted as to Calhoun's *quid pro quo* claim.

---

**10.** The court notes that in the pleadings and pretrial contentions, Calhoun states a sexual harassment claim for *quid pro quo* and hostile work environment. The court notes that a legal allegation is insufficient to overcome summary judgment. *See* Fed.R.Civ.P. 56(e) (stating that the party opposing the motion "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial).

**1272**

### B. Hostile Work Environment [11]

 Plaintiffs contend that the sexual harassment created a hostile work environment. A hostile work environment claim challenges workplace practices rather than tangible job benefits. To maintain a Title VII claim under this theory of sexual harassment, an employee must prove five elements, the first three of which are synonymous with the first three elements necessary to establish a *quid pro quo* claim: (1) the employee must belong to a protected class—in the instant case, the employee must be female; (2) the sexual harassment must be unwelcomed; (3) the harassment must be based on gender; (4) the harassment must affect a term, condition, or privilege of employment; and (5) here, the employee must establish liability based on the theory of respondeat superior. *Henson,* 682 F.2d at 903–905.[12]

 The parties need only stipulate that the plaintiffs are female to satisfy the first element. In proving the second element, that the harassment was unwelcome, each plaintiff must show that she neither "solicit[ed] nor incite[d] it, and ... that [she] regarded the conduct as undesirable or offensive." *Id.* at 903. Under the third element, plaintiffs must show that but for the fact of her sex, she would not have been the "object of harassment." *Id.* at 903–04.

 The fourth element requires a showing that the harassment in its totality is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* — U.S. —, ——–——, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295

(1993). The pervasiveness of the conduct turns "not only on the frequency of the incidents, but the gravity of the incidents as well." *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1511 (11th Cir.1989). While a "'mere utterance of an ... epithet which engenders offensive feelings in a employee,' does not sufficiently affect the conditions of employment to implicate Title VII," the environment does not have to be so severe as to cause a "nervous breakdown" or "seriously affect employees' psychological well-being." *Id.,* — U.S. at ——–——, 114 S.Ct. at 370–71 (citations omitted).

 As to the fifth element of plaintiffs' prima facie case, an employer is not strictly liable as in the *quid pro quo* harassment situation.[13] As explained by this circuit:

Strict liability is illogical in a pure hostile environment setting. In a hostile environment case, no quid pro quo exists. The supervisor does not act as the company; the supervisor acts outside "the scope of actual or apparent authority to hire, fire, discipline, or promote." Corporate liability therefore, exists only through respondent superior.

*Steele,* 867 F.2d at 1316. To prove indirect liability (respondeat superior), plaintiff must prove that the employer knew or should have known of the alleged discriminatory conduct. *Id.* To show that the employer knew of the harassment, an employee can satisfy his or her burden by either "showing that [he or] she complained to higher management of the harassment, or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive

---

**11.** Under Title VII, "abusive work environment" is interchangeable with "hostile work environment." *Harris v. Forklift Systems, Inc.,* — U.S. ——, ——, 114 S.Ct. 367, 369, 126 L.Ed.2d 295 (1993).

**12.** The shifting burdens of proof and production employed in Title VII disparate treatment cases, as mandated by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), do not apply to sexual harassment based on hostile working environment claims. *Henson,* 682 F.2d at 905 n. 11 (11th Cir.1982). As explained in *Henson,* the *McDonnell* analysis "serves to 'progressively sharpen the inquiry into the elusive factual question of intentional dis-

crimination,' [citation omitted] in a case where prohibited criteria and legitimate job related criteria often blend in the employment decision." *Id.* In contrast, a hostile working environment claim "does not present a factual question of intentional discrimination which is at all elusive." *Id.*

**13.** Plaintiffs argue that Shoney's, Inc. may be held "directly liable" for the conduct of its agents irrespective of knowledge. As in *Virgo v. Riviera Beach Assoc., Ltd.,* 30 F.3d 1350 n. 9 (11th Cir. 1994), plaintiffs "confuse the standards imposed in hostile environment claims with those applied in qui pro quo claims."

knowledge." *Henson,* 682 F.2d at 905. The inquiry, however, does not end here. Plaintiffs also must show that defendant failed to take "prompt and appropriate remedial action" in responding to the plaintiff's allegations or after learning of the harassing conduct. *Sparks,* 792 F.Supp. at 744; *Steele,* 867 F.2d at 1317.

### Analysis

At the risk of being redundant, the court again begins its analysis by finding that plaintiffs, who are females, belong to a protected group and that the harassment of which they complain ensued because of their gender.

#### 1. *Splunge*

■ As discussed, *supra,* Splunge has sustained her burden of proof as to the third element of her claim, i.e., that she did not solicit sexual advances and considered her supervisors' conduct to be offensive and intolerable. In looking at the totality of the circumstances, the court further finds that Splunge has raised a genuine issue of material fact as to whether the alleged harassment is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Harris,* ——— U.S. at ———, 114 S.Ct. at 370. Splunge's testimony is replete with incidents which reasonably fall within the parameters of Title VII sexual harassment based upon a hostile working environment. Specifically, her supervisors engaged in conduct including: frequent "sexual comments" and jokes; comments about her "big behind;" "plenty" of remarks about her breasts, including how "big and soft" they were and that she needed a larger shirt; one incident wherein McClellan cornered her in the freezer and told her she could not leave until she kissed him, to which she replied that they would freeze in this "mother f_____;" references about McClellan's affair with Splunge's co-employee; a comment that only "fine sexy things" could work at the front counter; one incident wherein McClellan rubbed against her and told her he knew she liked it; comments on how good plaintiff looked and smelled; and a two-hundred dollar solicitation by McClellan to come to his motel room. The combination

of sexual innuendo and comments overtly demeaning to Splunge are more than sufficient to defeat summary judgment as to whether the environment adversely affected her ability to perform her job.

The court is further convinced that while Splunge never complained to higher management about the harassment, she has interposed a genuine issue of material fact as to whether the openness and pervasiveness of the harassment infers knowledge on the part of defendant Shoney's, Inc. Splunge's deposition testimony and the affidavit of Jones discuss in detail the work environment at Captain D's and describe numerous instances of harassment. Moreover, Johns and McClellan, both supervisors, were themselves the persecutors and even laughed about it. They also were utterly unresponsive in remedying the situation.

Finally, the court in examining the merit of Splunge's hostile working environment claim has considered the evidence, which supports her *quid pro quo* sexual harassment charge. *See Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1068 (M.D.Ala.1990) (Thompson, J.) (finding that the "sexual overtures directly linked to employment may be so pervasive or so offensive as to create a hostile environment"). Accordingly, summary judgment as to Splunge's hostile working environment claim is due to be denied.

#### 2. *Calhoun*

■ Calhoun's complaints, while more limited than Splunge's, include inappropriate comments by her supervisors about her buttocks, sexual insinuations that black females are better lovers than white females, a photograph of a naked woman tied to a bed, as well as public displays of affection between an assistant manager and employee. The court finds that Calhoun at no time invited the alleged harassment or welcomed it; in fact, Calhoun stated she was offended by her supervisors' conduct.

The court also finds that Calhoun has created a genuine issue of material fact as to whether the conduct was pervasive enough to affect the terms and conditions of her employment. Incidents of sexual innuendo and sexually derogatory language, as well as sex-

ual conduct between a supervisor and co-employee, are not so trivial and isolated to justify a disposal of plaintiff's claim before trial.

Defendant argues that because Calhoun admitted that she never complained to anyone about the alleged sexual harassment, notice should not be imputed. The court disagrees and finds for the following reasons that a genuine issue of material fact exists as to whether defendant knew or should have known of the alleged harassment. First, the court notes that plaintiff did not have notice of the Fair Treatment Guarantee. *See* Jones' Aff. at 1. Even if Calhoun did have notice, however, the internal grievance procedures required employees to first report complaints, including allegations of sexual harassment, to their immediate supervisor and then the area manager, the very ones who were harassing Calhoun. Clearly, if the lower management was charged with the responsibility of resolving harassment problems, its participation in inappropriate sexual conduct toward employees could be imputed to higher management. Second, in hostile working environment cases, courts "generally treat the issue of employer liability as a question of fact and emphasize that various circumstances may be considered in determining employer liability, such as the duties and authority of the supervisor, and the existence and efficacy of anti-discrimination policies and grievance procedures." *Nichols v. Frank,* 732 F.Supp. 1085 (D.Or.1990).

Finally, the court is reluctant to decide a Title VII case on a Rule 56 motion and takes heed of the Eleventh Circuit's warning that summary judgment is a "lethal weapon, depriving a litigant of a trial on the issue" and should be used sparingly. *Tippens v. Celotex Corp.,* 805 F.2d 949 (11th Cir.1986).

The court emphasizes that its findings that defendant is not entitled to summary judgment as to Calhoun's claim of hostile working environment should not be read to imply that defendant necessarily should be held liable. Rather, the court's conclusion is merely that the evidence, when taken in the light most favorable to Calhoun, survives defendant's motion for summary judgment. Defendant later may produce evidence tending to contradict and rebut Calhoun's allegation, thus precluding recovery.

### 3. *Smoot*

Smoot alleges a pattern of incidents by her supervisors, including several indecent proposals for sex, inappropriate touching, unwarranted feeling of her buttocks, comments by Webber about how she would be in trouble if he did not have a girlfriend, use of vulgar language, and sexual innuendo such as "I want you, or I am going to get you." The court finds that the frequency and severity of the conduct rises to a level sufficient enough to overcome summary judgment. Plaintiff has raised an genuine issue of material fact as to whether the harassment is adequately pervasive or severe to affect her working conditions; such degrading conduct would likely affect the working conditions of any reasonable woman. *See Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486 (M.D.Fla.1991).

Moreover, the court has not limited its assessment of Smoot's hostile working environment claim to conduct specifically directed at her. Smoot testified that Webber habitually made comments to new employees such as "I want you, or I am going to get you." The court finds this testimony relevant for consideration. *See Sims,* 766 F.Supp. at 1074 (finding that "[a] person may be a victim of sexual harassment without being its intended victim; the challenged conduct need not be directed at the complaining individual").

For the same reasons previously enumerated in the court's discussion of Splunge and Calhoun, the court finds that the conduct is sufficiently severe and pervasive to create factual issues as to whether defendant had constructive knowledge. Additionally, the court notes that a failure of an employee to report incidents of harassment may suggest that the conduct was not so severe or pervasive as to alter plaintiff's condition of employment. *Silverstein v. Metroplex Communications, Inc.,* 678 F.Supp. 863 (S.D.Fla.1988). The court, however, cannot impute such a suggestion to Smoot where her failure to report the alleged harassment is coupled with a fear of retaliatory termination

and an unawareness of defendant's internal grievance procedure. *See Hopkins v. Shoe Show of Va., Inc.,* 678 F.Supp. 1241 (S.D.W.Va.1988) (finding that the reasonableness of plaintiff's failure to make employer aware of supervisor's conduct precluded summary judgment on issue of employer liability).

### 4. *Tesha Scott*

■ First, the court acknowledges that Scott testified that the only conduct by Johns that bothered her was the comment about how big her buttocks were. However, the court finds that this comment by Johns coupled with McClellan's conduct is sufficient to overcome summary judgment as to whether she welcomed the advances. In fact, Scott was so self-conscious about Johns' comment that she would not tuck in her shirt at work. Moreover, plaintiff testified that she had a "problem" with McClellan's conduct. The court also finds, although somewhat reluctantly, that Scott has raised a question for the jury as to whether this conduct is sufficiently pervasive as to affect her working conditions.

Again, defendants assert that because Scott never informed higher management of the harassment prior to filing the complaint, Scott cannot prove that the defendant knew of the harassment or that the harassment was so open and pervasive as to charge defendant with constructive knowledge. The court applies the same reasoning here, as it did to the allegations of Smoot, Splunge and Calhoun. Again, the deposition of Scott demonstrates the openness and pervasiveness of the alleged harassment and establishes an issue of fact as to whether or not defendant knew or should have known of the wrongful conduct.

### II. TITLE VII REMEDIES

On November 21, 1991, President George Bush signed into law the Civil Rights Act of 1991, which in part expanded the type of damages available for victims of intentional discrimination based upon sex. Pub.L. No. 102–166, S. 1745, 102nd Cong., 1st Sess. (1991). Prior to the 1991 amendments, victims of sex discrimination were limited to recovering equitable relief: generally lost back pay and benefits. 42 U.S.C. §§ 2000e–2000e–17. Hence, Title VII did not permit recovery for compensatory damages such as emotional distress or for punitive damages. *See Garner v. Giarrusso,* 571 F.2d 1330, 1339 (5th Cir.1978). However, the 1991 amendments to Title VII now permit victims of sexual harassment to recover compensatory and punitive damages and to demand the right to trial by jury. 42 U.S.C. 1981a, § 102. Here, plaintiffs seek compensatory and punitive damages; injunctive relief, including back pay; and attorney's fees. Pl.'s Compl. at ¶ 25.

■ However, the Court of Appeals for the Eleventh Circuit has refused to apply the 1991 Amendments retroactively. *Cross v. State of Alabama,* No. 92–7005, 1994 WL 424303 at *19 (11th Cir. Aug. 30, 1994). Here, each plaintiff began working at Captain D's prior to November 21, 1991, and ended her employment after said date. To the extent that plaintiffs seek compensatory and punitive damages for acts occurring prior to November 21, 1991, there is no remedy available. However, the record before the court on summary judgment does not specify the precise dates on which the alleged harassment occurred, plaintiffs claiming only sexual discrimination during each one's entire term of employment. Defendant also has failed to indicate to the court the dates on which each alleged incident of harassment transpired.

The court notes, however, that since each plaintiff began working for Captain D's shortly before November 21, 1991, the majority of their tenure occurred after said date. Thus, for purposes of summary judgment, the court has assumed that each alleged incident occurred after the 1991 Amendments. Defendant, of course, may refute this assumption at trial.

Finally, the court notes that plaintiffs do not seek reinstatement to their previous positions at Captain D's. It is therefore unlikely that plaintiffs can obtain an injunction to restrain practices at Captain D's which have injured plaintiffs in the past but which no longer affect them. *Henson,* 682 F.2d at 905.

## CONCLUSION

For the reasons stated herein, the court finds that summary judgment is due to be granted in favor of defendant Shoney's, Inc. and against plaintiffs Jo Catherine Smoot and Sandra Calhoun as to the *quid pro quo* sexual harassment claims under Count I of the complaint.

The court finds that summary judgment is due to be denied as to plaintiff Erica Benson Splunge's *quid pro quo* sexual harassment claim under Count I of the complaint.

The court further finds that summary judgment is due to be denied as to plaintiffs Erica Benson Splunge, Jo Catherine Smoot, Sandra Calhoun and Tesha Scott's claims alleging a hostile work environment caused by sexual harassment (Count I).

Finally, the court notes that plaintiffs have dismissed Counts II, III and IV of the complaint.